Alfred Grayson THOMAS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 88–SC–375–MR.

Supreme Court of Kentucky.

May 27, 1993.

Rehearing Denied Sept. 30, 1993.

Larry H. Marshall, Julie Namkin, Asst. Public Advocates, Department of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Atty. Gen., Elizabeth A. Myerscough, Dina Abby Jones, Asst. Attys. Gen., Frankfort, for appellee.

LEIBSON, Justice.

On March 1, 1987, Grace Back, a 75–year old widow living alone on Sugar Branch in Redfox, Knott County, Kentucky, was slashed to death. Her mutilated body was found lying in the road 150 yards from her house. Her house had been burglarized and burned.

The appellant, Alfred Grayson Thomas, and William David Morton, who was sixteen at the time, were separately charged with her murder, and with first-degree arson and first-degree burglary. Shortly before the trial the confederate, Morton, pled guilty to murder. He then testified as the Commonwealth's key witness at Thomas' trial in exchange for the Commonwealth's recommendation of a 30–year sentence in his case. Thomas was found guilty of wanton murder and first-degree burglary; not guilty of arson. He was sentenced to death for wanton murder and to 18 years' imprisonment for the underlying felony of first-degree burglary.

Morton provided the gruesome details of the slaying. In his pretrial statement he blamed Thomas, not only as the instigator of these crimes, but also as the sole person wielding the knife against the victim. At trial he persisted in his claim that Thomas was the principal malefactor, but he now acknowledged participating in slashing Mrs. Back. Nevertheless, Morton testified it was Thomas who stated that "we gotta kill her," who first caught up to the fleeing Mrs. Back, and who first slit her throat. Finally, Morton testified that Thomas "just went crazy on her, just cutting her and carving on her." Thomas did not testify at trial, but, based on his pretrial statements, the defense theory throughout the trial was Thomas, who had claimed he was too drunk to know what happened, was too intoxicated to have a specific intent to burglarize or to be the ringleader in this criminal episode.

The appeal includes 34 separate assignments of error, as follows:

1) Unduly restricting Witness Morton's cross-examination.

2) Failure to identify Morton's two juvenile adjudications for burglary at the penalty phase.

3) Failure to provide, prior to trial, details of the Commonwealth's deal with Morton.

4) Morton's testimony on cross-examination that he would "take a polygraph" on his trial testimony.

5) The trial court's instructions and the prosecutor's argument suggested to the jurors that their verdict was only a recommendation, and there was an automatic appeal.

6) Morton's testimony was in part the tainted fruit of a violation of the marital communication privilege.

7) Testimony from another witness, Ronnie Thomas, constituted both marital communication and hearsay violations.

8) Failure to provide funds for an independent psychiatrist.

9) Denial of a psychiatric examination for Morton.

10) Accomplice testimony was not corroborated.

11) Insufficient evidence to support a verdict of wanton "felony" murder.

12) A wanton murder instruction predicated on the theory appellant assisted another was improper since the indictment charged Thomas with committing the crime alone.

13) Failure to instruct on the defense of intoxication.

14) Failure to instruct on second-degree manslaughter.

15) Failure to instruct on criminal trespass.

16) Use of inflammatory photographs.

17) Evidence used to elicit sympathy for the victim.

18) Prosecutorial misconduct on closing argument at both the guilt and penalty phases.

19–23) Failure to strike disqualified jurors for cause.

24) Failure to grant a change of venue.

25–28) Errors in penalty phase instructions.

29) Improper cross-examination of Thomas' pastor at the penalty phase.

30) The penalty phase verdict form was improper because it required imposing the death penalty if the jury found an aggravating circumstance.

31) KRS 532.025(2)(b) is an unconstitutional infringement on judicial power because it specifies that the jury shall be instructed after arguments of counsel at the penalty phase of a death penalty case.

32) The death sentence in this case is unconstitutionally disproportional.

33) Young adults and women were unconstitutionally unrepresented in the jury pool.

34) The effect of cumulative errors deprived the appellant of his constitutional right to a fair trial.

The Majority of this Court has concluded that error has occurred with reference to two issues so substantial and prejudicial that the verdict and judgment must be set aside and the case reversed and remanded for a new trial. These issues are: (1) issues 19–23 with references to jury selection, and (2) issue 5 with reference to the verdict being only a recommendation. With regard to the remaining assignments of error, the Majority has concluded that some are unpreserved and the rest involved no error, or at worst, harmless·error. Since we deem it necessary to reverse this case for errors occurring during jury selection and use of the term "recommend," which will be discussed in detail in this Opinion, it is unnecessary to address the arguments being rejected, as we would do if we intended to affirm the judgment.

## I.  SPECIFIC CLAIMS OF JUROR SELECTION ERRORS

*ISSUE 19: Jurors who stated or implied they would favor automatic imposition of the death penalty upon a finding of guilt.*

There were three jurors challenged on this ground: Madison Martin, Marvis Short, and Walter Davidson.

Two of them, Madison Martin and Marvis Short, initially responded in a manner suggesting they were firmly committed to the death penalty upon conviction, but upon further questioning the prosecutor elicited from them responses that suggested they could consider all sentencing options. Furthermore, they were *not* challenged for cause.

However, the bias demonstrated by the answers of the third juror, Walter Davidson, was strong and unequivocal:

"DEFENSE COUNSEL: I believe you indicated that you had an opinion as to what the appropriate penalty would be if he's found guilty. Was I right in that?

DAVIDSON: Yes, I do.

DEFENSE COUNSEL: What is that opinion?

DAVIDSON: Death.

DEFENSE COUNSEL: Would you be able to consider any other penalty or would death be the penalty that you would feel at this point that you would probably vote for, if you were to find him guilty?

DAVIDSON: I definitely would vote for it.

DEFENSE COUNSEL: You would definitely vote for death?

DAVIDSON: Yes.

DEFENSE COUNSEL: Your Honor, I would challenge this juror."

The prosecutor attempted a rehabilitation of this juror by eliciting a positive response to further questions whether Davidson could decide a "proper penalty based on evidence that you heard in the penalty phase."

■ This juror had indicated a bias so strong that the prosecutor's questions did not serve to remove the disqualification. As stated in *Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713, 718 (1991), further questions do "not provide a device to 'rehabilitate' a juror who should be considered disqualified by his personal knowledge or his past experience, or his attitude as expressed on voir dire."

Davidson was struck by peremptory challenge, no doubt one exercised by the defense rather than the prosecutor, although this is implicit rather than explicit because the strike sheets have not been preserved.

Madison Martin and Marvis Short were *not* struck, no doubt because the defense had run out of peremptory challenges and their somewhat equivocal answers made leaving these undesirables on the jury less onerous than others, like Walter Davidson, against whom peremptories were used.

*ISSUE 20: Jurors whose answers, or at least some answers, implied they could not consider mitigating evidence, or at least certain types of mitigating evidence: Madison Martin (supra), James Bolan, Anna Caudill, and Eddie Jacobs.*

None of these jurors were challenged for cause, and none expressed an unequivocal opinion so strong that the trial court's failure to excuse them, *sua sponte,* should be viewed as reversible error. However, their answers were such that common sense suggests the defense would have found it desirable to strike them for cause if peremptory challenges had not been exhausted.

*ISSUE 21: Jurors who had formed an opinion of guilt based on pretrial publicity.*

1) Gilbert Hall admitted having read in the newspaper "the story that was told by Mr. Morton ... to the police after he was arrested." He then was asked:

DEFENSE COUNSEL: ... Do you think that would affect you and maybe make you more likely to believe him [Morton] if he gets on the stand and tells it again?

HALL: Well, yes.

The court then elicited responses to rehabilitate this expression of bias, but failure to sustain the challenge for cause falls far short of the standards we set for guaranteeing a neutral jury in *Montgomery v. Commonwealth, supra.* Gilbert Hall was struck by peremptory challenge, no doubt because the defense concluded pretrial publicity had prejudiced his opinion.

2) McCray Amburgey:

DEFENSE COUNSEL: What have you heard about the case the best you recall?

AMBURGEY: I just heard that he killed the woman and cut her up and set the house afire I guess.

DEFENSE COUNSEL: Did that cause you to have an opinion as to whether he's more likely to have done it or not?

AMBURGEY: Well, I don't know.

DEFENSE COUNSEL: Would you be able at this time to honestly presume him to be innocent at this point?

AMBURGEY: No. Not at this point, no.

DEFENSE COUNSEL: You understand that under the law right now he's presumed to be innocent?

AMBURGEY: Yeah, I understand that.

DEFENSE COUNSEL: Because of what you've heard, if I'm getting this right, you don't think that you could presume him to be innocent at this point?

AMBURGEY: No, not right now. Not this far in the case."

■ When the defense then challenged Amburgey for cause, the court undertook to rehabilitate him by explaining that "under the law any defendant, this Defendant, is presumed innocent until proven guilty," and elicited a response from Amburgey that "I understand that."

The challenge for cause was overruled. Amburgey was struck by peremptory challenge, no doubt by the defense.

In addition to Hall and Amburgey, challenges for cause based on knowledge of the case gleaned from pretrial publicity were made and overruled for at least eight more jurors: Larry Dixon, Helen Ratliff, Marvis Short, Dean Craft, Simon Fields, Robert Adams, Paul Gayheart and Paul Prater, because of positively answered questions suggesting they would try to be impartial despite their previous knowledge.

*ISSUE 23: Jurors related to the victim (by affinity, not consanguinity).*

1) Juror Steve Hicks stated that he was possibly related to the victim through his wife:

> "My wife says that if Mrs. Back (the victim) was any relation to the Reverend I.V. Back, then she would probably be related to Mrs. Back. I don't know myself."

Hicks stated this would not influence his decision, and he was not challenged for cause.

Hicks served as Foreman of the jury. Again, common sense suggests Hicks would have been struck because he thought the victim might possibly be part of his wife's family, if the defense had had further peremptories. But his answers provide nothing to suggest that the court should have *sua sponte* struck Hicks for cause.

2) Larry Dixon. This juror's disqualification based on kinship is an issue added to the case by appellant's motion for leave to file a supplemental brief, with supplemental brief attached, specifying that this juror should have been struck for cause because he is "married to [the prosecutor's] first cousin."

Apparently, on the court's initial voir dire, the juror had acknowledged a relationship to Andy Campbell, the prosecutor. At the close of voir dire defense counsel asked that Dixon "be called back in so we can get some more details on this relationship to the Commonwealth Attorney." The prosecutor then replied:

"In the interest of time, you asked and I can tell you he is married to my first cousin."

He added, "I would not object to him [defense counsel] questioning him further on that particular aspect. That's certainly not grounds for an automatic challenge. We are no relation."

Mr. Dixon was called back, acknowledged "My wife is first cousins to Randy," but when asked, "would that cause you any embarrassment or make you tend to lean toward Randy's side any," he responded "I don't think it would."

First-cousin law is most recently examined in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 546–47 (1988), reversing. There, the sheriff, a key witness, was "the victim's first-cousin." He was also related to juror James Snider in that "this juror's *wife* was the sheriff's first-cousin." We state:

> "Juror Snider should have been excused for cause under authority of *Pennington v. Commonwealth*, Ky., 316 S.W.2d 221 (1958). *Pennington* held that a juror who was on a first-cousin basis with the prosecution's key witness should have been excused for cause, even though he disclaimed any bias, because '[i]t is the probability of bias or prejudice that is determinative in ruling on a challenge for cause.' *Id.*, at 224."

We state further:

"Ordinarily it is within the discretion of the trial court as to whether to excuse a first-cousin by affinity. Such is not the case here where there were further answers showing a probability of bias...."

*Sanborn* then refers to *Marsch v. Commonwealth*, Ky., 743 S.W.2d 830, 833 (1988), holding "the trial court erred in failing to excuse for cause prospective jurors who were married to persons who were second or third cousins of the victim, where, as here, there were additional circumstances implying bias." *Sanborn, supra* at 547.

In the present case the defense's supplemental brief claims further circumstances implying bias in responses given earlier on voir dire regarding pretrial publicity, when Mr. Dixon was asked whether he would start out

considering Thomas more responsible in this case than the juvenile (Morton). Dixon stated that he would start out with that premise: "That's what the media led me to believe. I'll put it that way." Then, when the prosecutor attempted to rehabilitate him, Dixon stated:

"The media report was, you know, like I stated, it was the juvenile who was an accessory. Now that's what—like I say, I was not there. That is what the media said."

Then the court intervened:

"Mr. Dixon, can you put aside whatever you have read or heard and try the case solely on the evidence you hear during the course of the trial and the instructions on the law given you by the Court?

DIXON: I believe I could.

THE COURT: That's all we ask and we appreciate your candor...."

■ The Commonwealth attempted to rehabilitate Dixon by the "magic question," contrary to *Montgomery v. Commonwealth, supra.* Even if we assume for the purpose of argument that the challenge for cause based on knowledge of pretrial publicity was properly overruled, surely Dixon should have been excused when he was challenged later on when it was revealed that his wife was first-cousin to the prosecutor, Mr. Campbell. Dixon *sat on this jury,* although common sense suggests he was an obviously undesirable defense juror. At the conclusion of the trial, when it was time to designate the two alternate jurors and send the remaining twelve back to decide the case, the Commonwealth offered to "agree" with defense counsel's "prior challenge to Larry Dixon and let him be removed." But the defense counsel declined. Whether it would have cured the error for Dixon to sit throughout the trial, but not in final deliberations, is a moot question. The fact that he sat with the jury throughout the trial is reversible error.

■ The prosecutor misled the trial court into making a distinction between relationship by blood and affinity. The Code of Judicial Ethics (SCR 4.300 Canon 3 C(1)(d)) and the Statute of Judicial Disqualification (KRS 26A.015) both require disqualification where the Judge *"or his spouse"* is within a prohibited degree of relationship. In *Marsch* and *Sanborn, supra,* relationship by blood and affinity are treated the same for purposes of juror disqualification. *Sizemore v. Commonwealth,* 210 Ky. 637, 276 S.W. 524, 526 (1925) is an old case specifying that family relationship, whether "by consanguinity or by affinity," disqualifies the juror and is grounds for reversal if the degree of relationship suggests "the probability of partiality resulting therefrom."

**TO SUMMARIZE:**

1) One juror (Dixon) served who was challenged for cause and who should have been struck for cause where it is obvious the Commonwealth knew it was error to overrule the previous challenge for cause against this juror because the Commonwealth later offered to excuse him.

2) Three jurors (Davidson, Hall and Amburgey) who were challenged for cause, should have been struck for cause. Subsequently they were struck by peremptory challenge. Defendant used *all* of his peremptory challenges but did not ask for more.

3) Two more jurors (Short and Ratliff) against whom challenges for cause based on their knowledge of pretrial publicity were lodged and overruled were permitted to sit on this jury, because they disclaimed bias from this knowledge.

4) Four other jurors (Martin, Bolen, Caudill, and Hicks, the Foreman), who sat on this jury were obviously undesirable jurors because of the answers they gave on voir dire, but there was no contemporaneous challenge for cause. Thus the error is unpreserved, but the fact they survived peremptory challenge provides reason to believe the defense ran out of peremptories before being able to strike them.

In this case it is clear that the appellant used all of his peremptory challenges. After the trial court had finished ruling on peremptory challenges, from a panel of 29, 15 persons were struck by peremptory challenges, and 14 were seated; 12 regulars and two to be selected later as alternates. Since the defense had nine peremptories and the Com-

monwealth six, simple arithmetic confirms that both sides exercised all of their peremptory challenges. The Commonwealth argues that there is no proof the appellant did not willingly leave on jurors whom he now claims should have been struck for cause, rather than running out of peremptories. It is just as likely, if not more so, that there were jurors on the panel other than those challenged for cause who, for some reason not rising to the level of a challenge for cause, known only to the appellant's attorney, were even more undesirable than the ones who should have been excused for cause.

There are two prongs to the Commonwealth's defense against failure to excuse disqualified jurors:

■ First, the Commonwealth suggests that after expressing disqualifying opinions the jurors were rehabilitated by answers to leading questions asking whether they could put aside the opinions they held (based on news media coverage, relationship to the victim, the victim's family or the prosecutor, etc.) and be impartial notwithstanding. In the Commonwealth's view, once the jurors agree to accept the responsibility to decide impartially, any bias suggested by previous answers is harmless. *Montgomery v. Commonwealth*, Ky., 819 S.W.2d 713, 718 (1992) clarifies the law in this respect:

"There is no 'magic' in the 'magic question.' It is just another question where the answer *may* have some bearing on deciding whether a particular juror is disqualified by bias or prejudice, from whatever source, including pretrial publicity. The message from this decision to the trial court is the 'magic question' does not provide a device to 'rehabilitate' a juror who should be considered disqualified by his personal knowledge or his past experience, or his attitude as expressed on voir dire. We declare the concept of 'rehabilitation' is a *misnomer* in the context of choosing qualified jurors and direct trial judges to remove it from their thinking and strike it from their lexicon.

It makes no difference that the jurors claimed they could give the defendants a fair trial.... '[i]t is the probability of bias or prejudice that is determinative in ruling on a challenge for cause;' ... 'their statements, given in response to leading questions, that they would disregard all previous information, opinions and relationships *should not have been taken at face value.*' ... objective bias renders a juror legally partial, despite his claim of impartiality." [Emphasis original.]

Next, the Commonwealth contends that the error is not preserved because, with the possible exception of Juror Larry Dixon whom the Commonwealth was ready to agree to excuse at the end of trial, no juror participated in the verdict who had been challenged for cause, nor did appellant's counsel request *additional* peremptory challenges on the basis that the trial court failed to excuse disqualified jurors for cause. The Commonwealth's argument is based on language in *Turpin v. Commonwealth*, Ky., 780 S.W.2d 619, 621 (1989), wherein we stated the appellant, "Turpin can demonstrate no prejudice or constitutional violation because the jurors were removed by peremptory challenge by the defense," and the language in *Dunbar v. Commonwealth*, Ky., 809 S.W.2d 852, 853 (1991), stating "[a] defendant's right to be tried by an impartial jury is infringed only if an unqualified juror participates in the decision.... Even if a juror should have been removed for cause, such error does not violate the constitutional right to an impartial jury if the person did not actually sit on the jury."

This language in *Turpin* and *Dunbar* is in conflict with the procedural rights provided to a criminal defendant in RCr 9.36 and RCr 9.40, and is premised on a misunderstanding of the United States Supreme Court decision in *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

RCr 9.36 provides in pertinent part:

"When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, he shall be excused as not qualified."

RCr 9.40 provides in pertinent part: "[i]f the offense charged is a felony ... the defendant ['is entitled to'] eight (8) peremptory challenges," and if "additional jurors [alter-

nates] are called, the number of peremptory challenges allowed each side and each defendant shall be increased by one (1)."

■ *Ross v. Oklahoma* was premised on "a long settled principle of Oklahoma law that a defendant who disagrees with the trial court's ruling on a challenge for cause must, in order to preserve" error, (1) exercise a peremptory challenge to remove the juror, (2) "exhaust all peremptory challenges," and (3) prove that "an incompetent juror [was] forced upon him." 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80. *Ross* held that this Oklahoma law did not violate federal constitutional rights to an impartial jury or procedural due process. Kentucky law has always been to the contrary, that prejudice is presumed, and the defendant is entitled to a reversal in those cases where a defendant is forced to exhaust his peremptory challenges against prospective jurors who should have been excused for cause. Unlike Oklahoma procedural law, Kentucky rules of procedure require neither the "exercise of [a] peremptory challenge[ ]" to remove the juror challenged for cause, nor proof that "an incompetent juror [was] forced upon him" (*Ross*, *supra*) before prejudice is presumed. The long-standing rule in Kentucky requires only that:

> "A party must exercise all of his peremptory challenges in order to sustain a claim of prejudice due to the failure of the court to grant a requested challenge for cause." Abramson, *Kentucky Practice*, (Criminal Rules) Vol. 9, Sec. 25.50 (1987).

When a defendant *does* exhaust all his peremptory challenges, he has been denied the full use of peremptory challenges by having been required to use peremptory challenges on jurors who should have been excused for cause.

> "The voir dire examination plays a critical role in securing the right to an impartial jury.... The principal purpose of voir dire is to probe each prospective juror's state of mind and to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice. Thus, a voir dire examination must be conducted *in a manner that allows the parties to effectively and intelligently exer-*

*cise their right to peremptory challenges and challenges for cause.* While the peremptory challenge and the challenge for cause serve the same end, that of securing an impartial jury, they offer the parties two distinct, although complementary, methods of challenging biased jurors. Both types of challenges are important to the effort to obtain a fair tribunal." Bertelsman & Philipps, *Kentucky Practice*, (Civil Rules) 4th Ed., Vol. 7, Rule 47.01(2) (1984). (Emphasis added.)

■ The object of voir dire is to start the trial on a level playing field; it is *not* a level playing field if there are jurors on the panel who are predisposed to decide one way or the other. A defendant has been denied the number of peremptory challenges procedurally allotted to him when forced to use peremptory challenges on jurors who should have been excused for cause.

■ As stated in *Olympic Realty Co. v. Kamer*, 283 Ky. 432, 141 S.W.2d 293, 297 (1940), "the right to challenge a given number of jurors without showing cause is one of the most important rights to a litigant; any system for empaneling of a jury that prevents or embarrasses the full, unrestricted exercise of the right of challenge must be condemned." The rules specifying the number of peremptory challenges are not mere technicalities, they are substantial rights and are to be fully enforced. *See also Penker Construction Company v. Finley*, Ky., 485 S.W.2d 244 (1972), reversed for denying full exercise of peremptory challenges because prejudice is presumed; and *Ky. Farm Bureau v. Cook*, Ky., 590 S.W.2d 875 (1979), holding that the improper allocation of peremptory challenges constituted reversible error notwithstanding the opposing party failed to demonstrate actual prejudice.

■ *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1991) explains the difference between the two constitutional principles, trial by an impartial jury and trial by due process of law, as these concepts factor into denying challenges for cause. *Sanders* explains these two issues are separate and distinct. In *Sanders*, we asked whether any biased juror participated in the decision of

the case. Concluding that none did, we held that the right to be tried by an impartial jury was not infringed. That did not end the inquiry, however, as the Commonwealth would have it. Secondly, we treated at length the three jurors unsuccessfully challenged for cause, *none* of whom tried the case. We concluded that the trial court had *not* erred in refusing to excuse them for cause, and therefore we did not consider whether, had error occurred, such error would have deprived the defendant of a substantive right provided by state law—the right of peremptory strikes against qualified jurors. This procedural right is not an "impartial jury" question, but a "due process" question. *Ross v. Oklahoma, supra,* recognizes this distinction. *Turpin* and *Dunbar,* misapplying *Ross v. Oklahoma,* do not.

▮ In the present case, the trial court failed to sustain challenges for cause presented on grounds so substantial that the failure to disqualify the jurors for cause must be viewed as an abuse of discretion. The appellant exercised all of his peremptory challenges. Therefore, the process deprived him of peremptory challenges. In such circumstances, the conviction of a defendant must be reversed regardless of whether any juror proved to be disqualified on voir dire actually participated in the final decision.

## II. ERROR IN THE COURT AND THE PROSECUTOR USING THE WORD "RECOMMEND" RATHER THAN "FIX" TO DESCRIBE THE JURY'S FUNCTION IN SETTING THE DEATH PENALTY

▮ This case was tried in March 1988, in the midst of a controversy highly publicized within the legal profession over the use of the word "recommend" to describe the role of the jury in handing down a death sentence. The decision of the United States Supreme Court in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), initiated this controversy. In *Caldwell,* the Court recognized "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropri-

ateness of the defendant's death rests elsewhere." *Id.,* at 328–29, 105 S.Ct. at 2639. *Caldwell* requires reversal when any action by the court or prosecutor "mislead[s] the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright,* 477 U.S. 168, 184–85, n. 15, 106 S.Ct. 2464, 2473, n. 15, 91 L.Ed.2d 144 (1986). Our Court had already reached a similar result in *Ice v. Commonwealth,* Ky., 667 S.W.2d 671, 676 (1984), stating it is improper in a death penalty case by instructions or comment to convey "the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one." Our Court applied this same reasoning in reversing a death penalty verdict in *Ward v. Commonwealth,* Ky., 695 S.W.2d 404 (1985) and in a Concurring Opinion two Justices stated:

"Further, we should order that, prospectively, the forms of verdict provided to the jury to use upon a finding of guilty should provide 'and fix the defendant's punishment at ____,' rather than using 'and recommend a punishment of ____.'" *Id.* at 409.

In *Tamme v. Commonwealth,* Ky., 759 S.W.2d 51, 53 (1988), we did exactly that, prospectively banning the use of the word "recommend" "with reference to a jury's sentencing responsibilities in voir dire, instructions or closing argument." *Tamme* was not rendered until a few months after this case was tried, but the handwriting was on the wall when this case was tried.

Despite this forewarning, during the penalty stage, rather than asking for the sentence of death, the prosecutor urged the jury to "recommend" to Judge Morgan the penalty of death, and the jury instruction at the penalty phase reinforced that the jury's duty was only to "recommend," and this concept was reinforced by repetition in the instructions related to fixing a penalty for burglary and arson.

Notwithstanding, there might be some difficulty in deciding whether this case should be reversed under the standard enunciated in *Ice* and *Ward, supra,* were it not for the colloquy between juror Larry Dixon and the

court, during which the prosecutor told the juror there was "an automatic appeal" from any death penalty verdict the jury returned, and the court openly agreed, stating "any case in which the death penalty is given is automatically reviewed by the Supreme Court of Kentucky." With this colloquy in mind, the question whether the jury fully shouldered the "awesome responsibility" for deciding the death penalty (*Ice, supra*) is in serious doubt, and the verdict is unreliable.

This error was preserved, and the subsequent admonition that the juror was "not to be concerned by anything that might happen" later could not cure it. The juror had the message, and carried it with him to the jury room.

## III. CONCLUSION

For the foregoing reasons, the trial court's judgment is vacated, and this case is remanded to the trial court for further proceedings consistent with this Opinion.

STEPHENS, C.J., COMBS, LAMBERT, LEIBSON and REYNOLDS, JJ., concur in reversing this case on claims of juror selection errors and the use of the term "recommend" to describe the jury's function. On all other issues, the trial court is affirmed.

By separate opinion, LEIBSON, J., joined by COMBS, J., dissents on three issues as stated therein. STEPHENS, C.J., joins and would reverse on the second and third of these issues.

WINTERSHEIMER, J., dissents by separate opinion in which SPAIN, J., joins.

LEIBSON, Justice, concurring in part/dissenting in part.

I concur in the Majority Opinion as regards jury selection errors and error in using the word "recommend" to describe the jury's role in setting the death penalty. I dissent insofar as it holds there were no other substantial errors requiring reversal. There are four other assignments of error which should have been sustained.

## I. CHANGE OF VENUE

This is another case involving a gruesome murder in a sparsely populated, rural county, with high visibility coverage of the details. "The grisly stabbing death of a 75–year old neighbor" was front-page news in the local newspaper, the *Troublesome Creek Times, Voice of Knott County.*" A complete account of Morton's statement to the police blaming Thomas, with extensive quotations, was published on the day they were indicted, and press coverage followed the progress of the case through the courts.

On January 28, 1988, the Petition for Change of Venue based on this pretrial publicity was overruled. The required affidavits stated the accused could not be afforded a fair trial. Seven articles from the *Troublesome Creek Times* were attached to the motion. The argument was that the newspaper accounts relied upon Morton's version of what happened, and jurors would be more inclined to believe it to be true when they heard the story repeated at trial. The court stated counsel could renew the motion after voir dire examination.

The voir dire revealed that *all but two* of 67 prospective jurors who were questioned on the record were knowledgeable about this case: had read or heard about it through the media or talk in the community, or both. One prospective juror stated that "everybody" had heard about the case and another that many he had talked to thought the two defendants "had done it." Juror Larry Dixon repeated the details of the crime, a complete picture, from what he had heard and read.

Of the 67 prospective jurors, the trial court struck 24 for cause because they admitted they could not be fair, or expressed an opinion based on pre-trial publicity. Defense counsel unsuccessfully moved to strike ten more jurors for cause on grounds that they admitted they had read the details of this case in the paper. This included two of the jurors who actually sat on this case, Marvis Short and Helen Ratliff.

Notwithstanding that voir dire confirmed the pervasive nature of the pre-trial publicity, and the need for a change of venue, when defense counsel renewed its motion for a

change of venue at the end of voir dire, the motion was overruled. What is the point in telling the defense it can renew the motion after voir dire, if, when the answers on voir dire confirm the need for a change of venue, the motion is nevertheless overruled?

Failure to change venue was an abuse of discretion in the circumstances. The case should be reversed on this ground and the trial court directed to grant a change of venue for the next trial.

*Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), involved a jury permeated by newspaper publicity in circumstances remarkably similar to the present one. The United States Supreme Court reversed a criminal conviction for failure to grant a change of venue, stating the defendant was denied his constitutional right to an impartial jury. The Court held the fact that it is ultimately possible to seat a jury of citizens who disclaim knowing or intentional bias does not resolve the problem, nor cure the error:

> "Impartiality is not a technical conception. It is a state of mind." 366 U.S. at 724, 81 S.Ct. at 1643.

*Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), recognizes a showing of actual prejudice is unnecessary if the "procedure employed by the state involves such a probability that prejudice will result that it is deemed inherently lacking in due process."

Our Kentucky Constitution, Sec. 11, requires "trial by an impartial jury," and, to insure it, it requires "the general assembly may provide by a general law for a change of venue ... to the most convenient county in which a fair trial can be obtained." The General Assembly has so provided in KRS 452.210–.220, and the time is past due for us to take this constitutional provision seriously and insist it be carried out. Certainly, it is much easier now to move cases from one county to another than it was 200 years ago when the right to trial by an "impartial jury" was first guaranteed by our Kentucky Constitution. If anything, there is more reason now, rather than less reason, to demand trial judges move a case from a community where the circumstances of the offense have been widely reported on and discussed. The constitutional guarantee of a neutral jury means one that will decide the case on the evidence presented in open court rather than the knowledge and opinions that the jurors bring in with them to court, even if the jurors are willing to disclaim such knowledge and opinions.

We should direct a change of venue for retrial of this case.

## II. LIMITING CROSS–EXAMINATION OF MORTON, THE KEY PROSE-CUTION WITNESS

Cross-examination was limited in two ways: (1) the trial court refused to allow defense counsel to identify Morton's previous juvenile adjudications as burglary convictions, and (2) the trial court unduly restricted defense counsel's cross-examination into the circumstances surrounding Morton's plea of guilty.

First, with reference to suppressing the evidence Morton had on two previous occasions been convicted of burglary:

Obviously impeachment on grounds of prior conviction of a felony has nothing to do with the issue before us. *See* KRE 609 and *Commonwealth v. Richardson,* Ky., 674 S.W.2d 515 (1984). Indeed, unlike Federal Rule of Evidence 609(d), in Kentucky evidence of juvenile adjudications are inadmissible to impeach a witness even if the crime is the equivalent of a felony.

However, the point of this cross-examination was *not* to impeach Morton's credibility by proof he was a convicted felon; it was to disprove critical facts asserted in Morton's testimony, to wit: that Thomas took the lead in this enterprise and Morton was a relatively blameless juvenile accomplice. Since Morton had been shielded from having to identify his adjudications, the prosecutor could argue, and did argue, that Thomas planned these crimes and was the principal perpetrator; that Morton was only a boy whom Thomas had led astray. A reasonable juror might have received a significantly different impression of Morton's credibility, and of the extent of his participation, had counsel been permitted to identify Morton's previous adjudications.

As stated in *Sparks v. Commonwealth,* 193 Ky. 180, 235 S.W. 767, 770 (1921), the fact that these offenses could not be identified under the rule related to impeachment for conviction of a crime does not "exempt[ ] a witness from interrogation in regard to circumstances and facts which, when developed, will disclose his interest in the controversy, his motives and prejudices, with the view of enabling the jury to place a proper estimate on his testimony."

The key case on this issue is *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), holding that refusal to allow a defendant to cross-examine a key prosecution witness to show his probation status following an adjudication of juvenile delinquency denied the defendant his constitutional right to confront the witness, notwithstanding the state's policy protecting anonymity of juvenile offenders. The question here is the reliability of the witness' testimony regarding certain specified facts. This evidence was relevant to discredit specific testimony regarding the relative culpability of Morton and Thomas without regard to its admissibility under the rule related to impeachment by proof of conviction of a crime.

For similar reasons, the trial court erred in excluding cross-examination as to the details of the discussions between Witness Morton and his attorney regarding the plea negotiations in his case. Morton pled guilty before Thomas was tried, and the question was to what extent Morton was testifying out of conscience and to what extent his testimony was influenced by the deal he had made. Morton's testimony was that his reason for confessing, and then testifying, was remorse rather than escaping punishment. Evidence regarding the details of his attorney's rather extensive plea negotiations as conveyed to Morton may well have tended to refute this claim. The counsel he had received in making this deal may have had a direct bearing on the testimony he now offered against Thomas, and his plea of guilty obviated any need for further consideration of the attorney/client privilege. This was legitimate cross-examination under *Davis v. Alaska, supra.* Also, it qualifies as having denied the defendant "a meaningful opportunity to pres-

ent a complete defense," as discussed in *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986).

## III. ERROR IN REFUSING TO PERMIT THOMAS TO IDENTIFY MORTON'S PRIOR JUVENILE ADJUDICATIONS FOR BURGLARY AT THE PENALTY STAGE

This evidence was offered to show that Morton was a seasoned criminal in the same context as Thomas, i.e., two prior burglary convictions, and since Morton got a deal for 30 years, the death penalty for Thomas would represent disparity in sentencing.

Defense counsel argued that the identification of Morton's juvenile adjudications as burglary was necessary to rebut the prosecution's closing argument at the guilt phase that these crimes never would have occurred if the appellant had not "led Morton into this burglary" and had not led "this young man astray." Counsel further argued that since the jury was "going to receive evidence that Mr. Thomas committed two prior burglaries," the jury should know that Morton also previously committed two burglaries. While disproportionate sentencing is not a statutory mitigating factor specifically enumerated in KRS 532.025(2)(b), when the evidence relates to a co-defendant, such evidence should be admitted. First, it is a reasonably implied corollary to statutory mitigator # 5:

"The defendant was an accomplice in a capital offense committed by another person and his participation in the capital offense was relatively minor. . . ."

Secondly, KRS 532.025(2), in covering mitigating circumstances which the jury may consider, does not confine mitigation to the enumerated mitigating circumstances, but calls for consideration of "any mitigating circumstances."

Finally, the fact that KRS 532.075(3)(c) requires the Supreme Court, on review of a death penalty case, to consider "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases," strongly suggests the probity of evidence of the sentencing disposition of a confederate as mitigating evidence.

## IV. THE TRIAL COURT'S VERDICT FORM

Although this error was not preserved, it is one that should be addressed because this case is being reversed and remanded for a new trial.

The only place on the forms of verdict provided to the jury at the penalty phase to write in its finding that "aggravating circumstance or circumstances exist in this case" was on the *same* verdict forms (Nos. 3 and 4) which, when completed, provided for confinement in the penitentiary for either (1) life without benefit of probation or parole until the defendant has served a minimum of twenty-five (25) years (LWOP/25) or (2) the death sentence. There was no way to complete and sign either of the verdict forms finding an aggravating circumstance without fixing an aggravated penalty.

KRS 532.030(1) covers the range of penalties available "when a person is convicted of a capital offense," and in addition to death or LWOP/25, it provides for lesser sentencing options of "a sentence of life, or to a term of not less than twenty (20) years," as authorized sentences.

This is *not at all* clear from the verdict forms provided, although it is contradicted by Instruction No. 1, "Authorized Sentences." The potential that the jury was misled by the verdict form remains unresolved. *Cf. Franks v. State*, Ok.Crim., 636 P.2d 361, 366–67 (1981), where the court decided that "the act of using the death sentence verdict form to indicate [the jury's] findings could have resulted in a failure to fully consider mitigating circumstances and led to an erroneous recommendation of the death sentence."

The verdict forms used here conformed to those prescribed in 1 Cooper, *Kentucky Instructions to Juries (Criminal)*, Sec. 12.10 (1993 ed.), but if the verdict forms are misleading, it is no legal answer to say it was copied out of Cooper's book, and it serves no purpose to perpetuate this abuse. There is *no reason why separate verdict forms should not be provided:* (1) one upon which the jury would write in whether and what aggravating circumstances it has found, which duly notes "the finding of an aggravating circumstance authorizes but does not require an aggravat-

ed sentence of confinement in the penitentiary for life without benefit of probation or parole for a minimum of 25 years or death," and (2) two more separate, different forms for the jury to execute if they elect either LWOP/25 or death.

Otherwise the jury has been funnelled into fixing one of the aggravated penalties, rather than retaining the option to fix a lesser penalty.

COMBS, J., joins this opinion. STEPHENS, C.J., joins parts II and III of this opinion.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because I believe it represents a substitution of the view of the reviewing appellate court for the discretionary decisions of the trial judge in regard to the voir dire examination and challenge of jurors.

Thomas argues that three potential jurors, Martin, Short and Davidson, should have been excused for cause because they would automatically fix a punishment of death. He did not move to strike either Martin or Short on this ground and consequently the allegation is not properly preserved for appellate review. *McDonald v. Commonwealth*, Ky., 554 S.W.2d 84 (1977). Davidson was not selected as a juror. Certainly both Martin and Short believed in the appropriateness of the death penalty as punishment. However, there is no evidence of any preconceived belief as to the application of the death penalty to this defendant. Thomas did not challenge for cause either Martin or Short because he believed they would automatically impose a death sentence.

Thomas further contends that Martin, Bolan, Caudill and Jacobs were not properly seated as jurors because they could not consider mitigating evidence. When the proper role of mitigating evidence was explained, each of the four jurors recognized the duty of a juror to consider such evidence and each indicated he would respond properly if selected to serve. The manner in which the questions were presented provided some confusion to the jurors but they ultimately understood their proper role. Defense counsel did

not strike for cause any of the four jurors mentioned. However, a review of the entire voir dire proceedings indicates that the defense counsel made numerous other challenges for cause. It would be reasonable to assume that acceptance of these four jurors was a considered trial strategy. *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665 (1991).

Thomas next maintains that Hall and Amburgey had formed an opinion about his case. Neither person was selected to sit on the jury panel. The record is silent as to whether the prosecution or the defense exercised a peremptory challenge in regard to either of these individuals. In any event, Thomas has no reasonable basis for complaint.

The claim that Hicks was improperly seated as a juror is without merit. Thomas argues that Hicks was a "possible" first cousin to the victim and should have been excused for cause because of the close relationship and the potential for bias. As such the issue is not properly preserved for appellate review. RCr 9.22. There is no evidence in the record to support the conclusion that the juror and the victim were even "possible first cousins." At best, there is only supposition or speculation as to any relationship. The trial judge was within his sound discretion in refusing to automatically exclude the juror. Defense counsel did not challenge Hicks. Again, we may assume that the decision not to even challenge the juror was a trial strategy. *Sanders, supra.*

A careful review of this extensive record indicates that there is nothing which shows that the trial judge failed to properly exercise his discretion in regard to the challenges for cause of the jury panel. The mere fact that the defendant exercised all his peremptory challenges does not provide a sound basis for asserting that the process relating to challenges for cause automatically deprived him of a proper number of peremptory challenges.

As the majority opinion notes, the victim, a 75–year–old widow living alone in rural Knott County, was slashed to death. Her home had been burglarized and burned. In addition, my examination of the record indicates that the electricity to the house had been cut by tearing circuit breakers outside the home; the telephone and TV satellite dish wires had been cut and the victim had been pursued for approximately 150 feet beyond her home where she was brutally stabbed. The injuries to the victim's body included: 5 stab wounds to the back of the scalp; 3 wounds to the face; 3 wounds to the front of the neck, one deep enough to cut the voice box or upper carotid artery and then through the esophagus; 9 wounds to the back of the right knee, one of which severed a major artery; 8 wounds to the back of the left knee; 2 wounds to the right buttocks; 6 wounds to the left buttocks, and 7 wounds to the chest and abdomen. The bowel and other internal organs were partially eviscerated as a result of one of the 21 inch stab wounds through the chest and abdomen. There were also three injuries to the thumb and fingers which indicated a defensive posture.

When considering this case as a whole, there is little likelihood that the result would be any different, and therefore the errors, if any, are nonprejudicial. RCr 9.24; *Abernathy v. Commonwealth,* Ky., 439 S.W.2d 949 (1969). The defendant is guaranteed a fair trial but that does not mean a perfect trial free of any and all error. *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). "What it does mean is that a litigant is entitled to at least one tolerably fair trial." *McDonald v. Commonwealth,* Ky., 554 S.W.2d 84 (1977), citing *Neely v. Strong,* 186 Ky., 540, 217 S.W. 898 (1920); *Berning v. Commonwealth,* Ky., 550 S.W.2d 561 (1977). A review of the entire proceedings indicates that Thomas received a fundamentally fair trial.

I would affirm the conviction in all respects.

SPAIN, J., joins in this dissent.