**Stephen F. HARMAN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 94–SC–488–DG.**

Supreme Court of Kentucky.

May 11, 1995.

Russell J. Baldani, Lee W. Rowland, Baldani, Rowland & Richardson, Lexington, for appellant.

Chris Gorman, Atty. Gen., E.M. Lowery, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

The appellant, Stephen F. Harman, was convicted by a Madison County jury of first-degree manslaughter and was sentenced to imprisonment for eighteen (18) years. He appeals from the decision of the Court of Appeals of Kentucky affirming the conviction and sentence. We granted discretionary review and also affirm.

A brief recitation of the chronological facts is necessary. In the spring of 1986, the appellant, Stephen Harman, while separated from his wife, met and in a few days moved into an apartment with a young divorced woman named LaDonna. Harman was stationed with the U.S. Navy in Bremerton, Washington, and LaDonna was in the process of breaking up with a boyfriend, John Thane. In December, after Harman's divorce became final, he and LaDonna were married. Each had a child by a previous marriage, and in 1987, a daughter, Bryanna or Breanna, whose nickname was "Breezy," was born to the couple. Harman underwent a vasectomy that year and he and LaDonna, along with her older daughter, Marissa, and Breezy, moved to Guam. In the fall of 1988, LaDonna returned to the state of Washington with the girls, and resumed her live-in relationship with John Thane. LaDonna became pregnant and informed Harman of this fact by telephone. She made a second brief trip to Guam, leaving Breezy with the appellant, and returned to Thane. She continued to live with Thane during her pregnancy and for three months after the birth of a little boy, Jesse Taylor Thane Harman, on June 27, 1989.

In October 1989, LaDonna left Thane and moved in with a step-sister. Having arranged a transfer to Navy recruiting duties in Richmond, Kentucky, the appellant Harman went to Washington, reconciled with LaDonna, and brought her and the three children to Richmond to live with him. Although Harman accepted the baby, Jesse, as his son, there were doubts as to whether he or Thane was actually the father. Harman

at various times described the little boy as "a very stubborn baby," prone to bruising and bleeding, and as "a mama's boy," and "a wimp."

On June 2, 1990, when Jesse was eleven months old, LaDonna went to work to care for a Mr. Wheeler, who was ill and bedridden. Since it was a Saturday, the appellant was at home to take care of the children. It was a hot day and baby Jesse had chronic diarrhea, was teething, and became irritable, according to the appellant, so he put the child in his crib and took the little girls outdoors while he worked in his garden.

The appellant later stated that when he went into the house sometime afterward, he heard Jesse crying and found him hanging upside down, outside the crib, with his foot caught between the crib rail and the bed, with his head against the hardwood floor. Harman testified that he picked Jesse up and he stopped crying. Jesse had messed his diaper, so Harman gave him a bath and a bottle. A knot rose on Jesse's forehead and bruises began appearing "all over." The baby started "breathing weird" and acting sleepy. The appellant called a friend to drive him and the children to Pattie A. Clay Hospital. Upon arrival at the emergency room, the appellant declared that Jesse was "hurt bad." Noting severe head injuries and abrasions and bruises on the baby's body apparently inflicted at different times, the staff notified the police and an investigation was begun. Jesse was transported to the University of Kentucky Medical Center by helicopter, where he died two days later as the result of brain swelling caused by a massive blow or blows to the head.

The appellant was subsequently indicted for Jesse's murder, was arrested and released on bond. At his four-day trial in January 1991, the appellant's jury was instructed on Murder, Manslaughter in the First and Second Degrees, and Reckless Homicide. He was found guilty of First–Degree Manslaughter and sentenced to imprisonment for eighteen years.

Although the medical testimony was not completely unanimous, the Commonwealth's case was exceptionally strong. The prosecution called eight medical witnesses, six of whom gave expert testimony that Jesse was the victim of, and died of, severe blows inconsistent with the appellant's explanation. Dr. Richards, the pediatrician who saw Jesse at the Clay Hospital emergency room, testified that the infant's condition indicated severe brain injury. He also noted the large bruise on the child's forehead, bruises about one week old on the chest, and a bruise on the leg. Dr. Richards testified that it was very unusual for children to sustain accidental bruises to the torso, and that his experience with crib falls indicated that the head injury was not the result of such an accident, but was due to a severe blow to the head.

Dr. Noonan, chairperson of Pediatrics at U.K., testified that Jesse was admitted there suffering from severe swelling of the brain and that he was marked by several bruises of differing ages; on his arm, left jaw, right side of his head, and over his eyes. She stated that from observing victims of child abuse for twenty-nine years, her observation of Jesse would have prompted her to report the case for investigation, had others not already done so. She testified that Jesse's injuries were not consistent with the history given by the parents. She was made aware that Jesse had experienced prolonged bleeding when circumcised as a newborn, so she ordered additional studies, all of which showed normal bleeding patterns. She testified that in her opinion, Jesse would not bleed or bruise more easily than other infants of eleven months, and that the swelling of his brain was caused by a severe blow to the head. Further, she stated that the autopsy showed no significant subdural bleeding, as would be expected if Jesse had had a bleeding disorder.

Dr. Walsh, a U.K. pediatric neurosurgery specialist, testified that his examination of Jesse and of his test results, showed that the infant was "brain dead" on June 3, and that such was caused by an injury of "tremendous severity" likely to occur only when a child is subjected to a major force, such as being struck by a car or baseball bat, or falling from a building. He emphasized that the injury could not be explained by a fall from a crib or by hitting the head while hanging

upside down. His further studies indicated no bleeding problem with the child.

The forensic pathologist who performed the autopsy on Jesse's body, Dr. Hunsaker, testified that the cause of death was "progressive cardiopulmonary insufficiency due to blunt force (impact) injuries to the head," likely the result of two separate blows.

The Fayette County Coroner, Dr. Hull, described Jesse's closed head injury as resulting from blunt trauma. He reported as medically "remarkable" his findings of multiple bruises of different ages over the surface of the body, and concluded that the infant's internal and external injuries were not consistent with a fall from a crib, or with the description of the event given by the appellant. Having eliminated the possibility of a contributing bleeding disorder, he ruled the death a homicide.

In addition to all the above medical evidence, Marie Wheeler, wife of the invalid patient whom LaDonna attended, testified as to a spontaneous statement made to her by Marissa, LaDonna's six-year-old daughter. Mrs. Wheeler took care of Marissa and her little sister, Breezy, while the Harmans attended Jesse's funeral. She stated that Marissa volunteered to her that her brother was dead and she was sad, and that "Daddy hurt Jesse" when he tripped over Breezy, became angry, and hit Jesse, who was choking, against a wall. At the trial, Marissa, who as a result of a hearing had been adjudged competent to testify, denied telling Mrs. Wheeler that her father had hurt Jesse, or tripped over Breezy, or hit Jesse against the wall. She did admit saying to Mrs. Wheeler, "My brother died and I'm sad." She also testified, "I know (Daddy) fell over Breezy and fell on Jesse, on accident."

 Against this evidentiary background, we now turn to the appellant's claims of reversible error on the part of the trial court. During his direct examination, Harman admitted that for six or seven months before he was divorced from his first wife, he cohabited with LaDonna, whom he later married. Subsequently on cross-examination, the prosecutor pursued the matter by asking the appellant if he took vows to be faithful to his first wife and an oath that he would

respect the marriage. Upon Harman's answering in the affirmative, the prosecutor asked whether he had violated the oath by living with LaDonna. The trial court overruled the defense objection, apparently reasoning that the defense had "opened the door" to these questions. The appellant then answered in the affirmative. Subsequently, the prosecutor alluded in his closing argument to the appellant's marital infidelity as evidence of his lack of credibility. Moreover, after the cross-examination of the appellant about his failure to keep his vows, the defense attempted to introduce the testimony of the appellant's work supervisor, Joe Marcum, regarding the appellant's good reputation for truthfulness and veracity, but was not allowed to do so.

The Court of Appeals found that the trial court did err, especially upon consideration of the combination of all three occurrences. The panel nevertheless found no cause for reversal in light of the overwhelming evidence against Harman. We agree with this conclusion, and even though the Court of Appeals did not cite *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), nor recite that these errors, even in combination, were "harmless beyond a reasonable doubt," we have no hesitance in so concluding. Nearly twenty years after *Chapman,* the U.S. Supreme Court in *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), wrote of the harmless error doctrine, that it *"recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence,* (citations omitted), *and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." Van Arsdall,* 475 U.S. at 682, 106 S.Ct. at 1436, 89 L.Ed.2d at 684–685. (Emphasis added.)

The appellant's second complaint in this Court is that he has been denied his right to an effective appeal since the videotape record was defective and inadequate to afford him a full and fair review of the trial. His motion in the Madison Circuit Court for a new trial on this ground was denied; however, the trial judge, Hon. James S. Chenault, held

that the appellant should not be deemed to have waived any objection at any bench conference where any part of the colloquy was not fully audible. Thereafter the appellant submitted a twenty-eight page narrative statement to supplement the inadequate transcript. The Commonwealth filed a three-page response wherein it stated that it either agreed with each point in the narrative statement of the appellant or was unable to recollect what was said by the defense, with the exception of only nine points which the response then discussed. The trial court approved both statements.

█ In particular, the appellant complains of the inadequacy of the record of the voir dire examination of three jurors whom he challenged for cause. The same complaint was raised in the Court of Appeals without avail. That court found from the narrative statements submitted by the parties and approved by the trial court, that the trial court committed no error in refusing to sustain the defense's challenges for cause of the three jurors, none of whom served on the jury for the trial. We agree. Prospective juror Tudor stated that years earlier he had been represented in his capacity as a bank trust officer by the lawyer now serving as the Commonwealth's Attorney. There was no objection nor defense question. Mr. Tudor was later challenged peremptorily. We see no error.

█ Prospective juror Gay was a retired Kentucky State Police Trooper, who answered that he could be fair and impartial. The third prospective juror was a Ms. Blevins who worked at the Clay Hospital. There was no showing that she knew anything at all about Jesse Harman's brief visit there. Both of these jurors were also peremptorily challenged. We again see no error. A trial court is properly allowed considerable discretion in connection with excusing prospective jurors. RCr 9.36(1) provides that only when there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence shall he or she be excused as not qualified.

█ For his final contention of error, the appellant cites three instances wherein the trial court permitted inadmissible hearsay to be admitted over his objection. The same

contention was dismissed by the Court of Appeals as insignificant or insufficient to require reversal. Again, we agree. The first instance was when Coroner Hull, after a lengthy description of Jesse's injuries, made a parenthetical observation, in support of his opinion that the injuries were inconsistent with a three-foot fall, that "reports, I'm sure, are present in the literature which indicate that it takes a great deal more force—" The statement was interrupted by the appellant's objection, which was overruled. The Coroner did not continue in this vein and no admonition was requested. Such a reference was completely innocuous and clearly was not prejudicially erroneous.

█ The next complaint regards a question and answer during the prosecutor's cross-examination of Susie Woods. She was asked whether she had made a statement previously to police Sergeant Love that the defendant "made no bones" about Jesse not being his child. Her answer was, "According to what I had heard from LaDonna, yes." The appellant's objection and request for an admonition were denied. We agree that since LaDonna did not testify, this answer included hearsay, if the statement was intended to prove the truth of the matter. Here however, the inquiry was only to show a prior inconsistent statement by way of impeachment of the witness. As such, there was no error in its admission. Even if there had been, it was harmless beyond any reasonable doubt.

█ The last instance of admission of alleged prejudicial hearsay concerns the testimony of the forensic pathologist, Dr. Hunsaker. On rebuttal, he was asked by the prosecutor if it was only *his* opinion that an infant's brain may show less structural damage than that of an adult, given the same object of impact and degree of force. The appellant's objection was overruled, whereupon the doctor replied that his opinion was based upon ten years' experience in forensic pathology and on the literature on adult and infant head trauma. He stated that others had written upon this subject extensively, including a Dr. Charles Hirsch, medical examiner in New York City. Indicating that Dr. Hirsch's treatise entitled "Cranio-cerebral Trauma and Interpretation of Head Injuries" supported his opinion, Dr. Hunsaker

read from the treatise. The appellant insists that this testimony was inadmissible hearsay. We disagree, since it appears that Dr. Hunsaker laid a sufficient foundation to establish this treatise as a "learned treatise" and a reliable authority on the subject. KRE 803(18).

For all the reasons set out above, the decision of the Court of Appeals and the judgment and sentence of the Madison Circuit Court are affirmed.

LAMBERT, REYNOLDS and WINTERSHEIMER, JJ., concur in this opinion by SPAIN, J.

LEIBSON, J., dissents by separate opinion in which STEPHENS, C.J., and STUMBO, J., join.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

The Court of Appeals held that the trial court erred in three respects but then excused the three errors as harmless. The Majority of this Court has agreed with the Court of Appeals. I too agree that the trial court erred, but do not believe the errors were harmless. First, during cross-examination of Harman, the prosecutor improperly smeared Harman's character with evidence of marital infidelity during a prior marriage. See *Barnett v. Commonwealth*, Ky., 763 S.W.2d 119, 124 (1989). The prosecutor then was erroneously allowed to argue that this irrelevant evidence of marital infidelity proved Harman was lying when he denied striking the child. The third error was that the trial court excluded evidence to prove Harman's good character for truthfulness despite KRE 404(a)(1), which states, "Evidence of a pertinent trait of character or of general moral character offered by an accused, or by the prosecution to rebut the same" is admissable. See *Shell v. Commonwealth*, 245 Ky. 223, 53 S.W.2d 524, 526 (1932).

Important parts of the videotaped trial record of the voir dire are inaudible. Unless Harman's version by narrative statement of the answers given on voir dire are accepted as true, Harman is denied due process by the state of the record.

Three jurors whom Harman challenged for cause should have been stricken by the trial court but were not. Prospective juror Gay, who was a retired Kentucky State Police Trooper, gave answers which "indicated he would not be fair and impartial" according to Harman's narrative statement. Prospective juror Tudor, a trust officer at First Security Bank, had been represented by the prosecutor when the prosecutor was in private practice. According to Harman's narrative statement, Mr. Tudor's answers indicated he would be aligned more with the prosecution than with the defense. The trial court's response, that he thought the juror was just trying to get off the jury, is speculation. The third prospective juror, Ms. Blevins, worked at Clay Hospital where Jesse was initially taken and was an acquaintance of Dr. Alan Richards, a pediatrician who treated Jesse in the emergency room of that hospital. Dr. Richards was an important witness who gave damaging testimony contradicting Harman and his expert witness, Dr. Bux, to the effect that Jesse's injuries were "not the norm" to be expected from a crib fall. Accepting as true Harman's version by narrative statement of the answers given on voir dire, there was "reasonable ground to believe" the jurors could not "render a fair and impartial verdict on the evidence," RCr 9.36(1), and these jurors should have been excused for cause.

When his challenges for cause were denied, Harman was forced to use peremptory challenges against these three jurors, thus exhausting his peremptories. *Thomas v. Commonwealth*, Ky., 864 S.W.2d 252 (1993), holds that it is a denial of due process to require a defendant to "exhaust all his peremptory challenges ... by having been required to use peremptory challenges on jurors who should have been excused for cause." *Shelton v. Commonwealth*, Ky., (1995), reiterates that improperly denying a challenge for cause denies due process when the defendant exhausts his peremptories.

Finally, two instances of impermissible hearsay provide further grounds for reversal. Coroner Hull testified to bolster his opinion by claiming "reports, I'm sure, are present in the literature...." Witness Suzie Woods testified to the effect that Harman's wife (who did not testify) supposedly said that Harman did not think Jesse was his child.

Although the central purpose of a criminal *trial* is, as the Majority Opinion states, "to decide the factual question of the defendant's guilt or innocence," an appellate court has additional considerations. One of those considerations is that a conviction should be set aside unless "the reviewing court may confidently say, on the whole record that the ... error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). I am not prepared to "confidently say" that these errors were harmless beyond a reasonable doubt.

The heinous nature of the offense of which this appellant is accused must not cause us to lose sight of the fact that justice must be administered according to law. We have no better method for arriving at the truth than the rules of evidence and procedure we have developed over time.

STEPHENS, C.J., and STUMBO, J., join.