# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# Supreme Court of Kentucky

2007-SC-000350-MR

4/22/10 *Kelly Klaber* b.C.

DEREK RENE EDMONDS            APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.       HONORABLE JUDITH MCDONALD-BURKMAN, JUDGE
NOS. 04-CR-001179-001 AND 04-CR-002445-001

COMMONWEALTH OF KENTUCKY           APPELLEE

AND            2007-SC-000359-MR

TYREESE HALL           APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.       HONORABLE JUDITH MCDONALD-BURKMAN, JUDGE
NOS. 04-CR-001179-002 AND 04-CR-002445-003

COMMONWEALTH OF KENTUCKY           APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING IN PART AND REVERSING IN PART

### I. INTRODUCTION

At a jury trial, Appellants Derek Rene Edmonds and Tyreese Hall were convicted of murder, first-degree sodomy, and first-degree robbery. Upon review of the record and Appellants' arguments, we affirm their convictions.

However, with respect to Appellant Derek Edmonds, we reverse and remand for the limited purpose of entry of an amended judgment on his sodomy conviction.

## II. BACKGROUND

Early in the morning of April 6, 2004, Clifton Agnew, a homeless man sleeping outside near the Salvation Army in Louisville, Kentucky, was beaten, hit with a crock pot, stabbed in the leg, and robbed. While unconscious, he was sodomized with a bottle and two sticks, which were shoved up his rectum, into his abdomen, and through his organs. A police officer saw someone flee the scene, but was unable to catch the suspect. Two police officers then discovered the victim bleeding from his head and rectum. He was barely alive, and EMS took him to the hospital, where he remained unresponsive and in a coma until his death.[1]

A twenty-seven-inch stick and a smaller fifteen-inch stick were recovered from the alley where the attack occurred; both sticks were covered in the victim's blood. A broken beer bottle with blood around the neck and a knife were also found, and police recovered a crock pot, which was dented, broken, and bloody.

Both Appellants were arrested that day. Hall had a swollen hand and blood spatters on his pants. Edmonds had blood-soaked pants and boots.

---

[1] After a few weeks, the victim was moved to a nursing home, but he never awakened from his coma.

DNA from the blood on both Appellants' clothing matched the DNA profile of the victim.

Hall gave a statement to police that day, claiming to have hit the victim on the leg with the crock pot and admitting to punching him and stabbing him in the leg with a knife. This statement was recorded and later played at trial.

At another time, Hall signed a statement confessing that he alone robbed and sodomized the victim, stating that Edmonds had only kicked the victim and then run away. He later testified that Edmonds pressured him to take the blame, which is why his original written statement only implicated himself.

Hall later gave a second statement to a detective over the phone wherein he implicated Edmonds' brother Dewayne in the violence. (He testified at trial that he did this only to get back at Edmonds, who he believed had gotten him arrested, and that the brother had not attacked the victim.) While on the phone, he also admitted to throwing the crock pot, hitting the victim's head, and claimed that Edmonds had sodomized the victim with a glass bottle. This statement was also recorded and played at trial.

Hall also testified at the trial, providing details of the attack. He claimed that Edmonds had been discussing robbing someone that day. Hall, Edmonds, and Edmonds' brother were walking down an alley on the day of the crime when a homeless man awoke and rose up. Hall testified that the man was reaching for something, so he attacked, punching the man in the face and knocking him down. He claimed he kicked the man and then picked up a

3

crock pot and threw it down on the victim's leg so hard that the crock pot broke. Edmonds' brother picked up the victim's wallet, threw it down, and then left the alley. Edmonds then started punching and kicking the victim. Hall testified that he walked away and came back several times, eventually asking Edmonds to stop. At that point, the victim was unconscious. Hall claimed he then saw Edmonds drag the unconscious victim through the gate in a fence, beat him some more, and that he heard Edmonds say, "I'm going to do him like they did our people back in the day," which Hall claimed referred "to racial stuff."[2] He testified that Edmonds then repeatedly sodomized the victim with a stick for about two minutes.

Edmonds denied having anything to do with harming Clifton Agnew when interrogated by police. He did not testify at trial, but did present multiple witnesses in his defense. Mark Murray and James Ford testified they heard Hall admit committing the crimes, specifically to robbing Agnew, sodomizing him with a bottle and stick, and hitting him with the crock pot. Another witness, Jeffrey Bryant, who had shared a holding cell with Hall, testified that all Hall claimed that Edmonds had done was come to Hall's rescue after the victim grabbed Hall, kicking the victim several times to get him off Hall. Yet another holding-cellmate testified that Hall had impliedly admitted to sodomizing the victim with a stick and hitting him in the head with the crock pot.

---

[2] Both Appellants are African-Americans, and the victim was Caucasian.

At trial, the victim's doctor and the medical examiner testified about his injuries. Dr. Bill Smock treated the victim in the emergency room, and he testified that the victim was bleeding from several sites on his head, had two stab wounds in his leg, and had "very significant intra-abdominal injuries" and a large amount of blood coming from his rectum. He testified, "Some object had been inserted forcefully into the rectum and beyond that into the abdominal cavity and beyond that up into the left lung area." He said that an object had been inserted into the victim's rectum at least twice. He used a chart to describe the injuries and he demonstrated with a prosecutor how long the stick was in comparison to a person's back. He identified eight photographs of the victim taken at the hospital the day he was admitted showing injuries to his face, eyes, ear, and anus.

Dr. Amy Burrows-Beckham performed the victim's autopsy. She testified that the cause of death was "the head injury he sustained when he was assaulted," with a contributing factor of loss of blood due to the extensive injuries to his abdomen and chest.

Appellants were convicted after a jury trial. Edmonds was sentenced to life without the benefit of parole or probation on the murder, life without parole on the sodomy,[3] and twenty years on the robbery. Hall was sentenced to life without the benefit of parole or probation for twenty-five years on the murder, twenty-five years on the sodomy, and twenty years on the robbery. Their appeals to this Court, therefore, are a matter of right. Ky. Const. § 110(2)(b).

---

[3] The sentence for sodomy was an error and is addressed below.

5

### III. ANALYSIS

The Appellants were tried together and took their appeals together. Because several issues are common to both their cases, their appeals are addressed in a single opinion. Individual issues are addressed separately.

**A.      Issues Raised by Both Appellants**

**1.      Humanizing/Victim Impact Evidence During Guilt Phase**

Appellants claim they were prejudiced by the testimony of Kaye Thomas, who visited a comatose Clifton Agnew in the hospital after hearing about his case on the news, and eventually became his legal guardian. Before trial, the prosecutors indicated they were going to call Thomas as their traditional "humanizing" witness as allowed under McQueen v. Commonwealth, 669 S.W.2d 519 (Ky. 1984). Appellants made written pretrial motions in limine to exclude Thomas's testimony, arguing it would be mostly irrelevant and highly prejudicial, and any probative value would be substantially outweighed by the prejudicial effect. See KRE 403. Appellants' motions in limine were denied.

Before Thomas was called by the Commonwealth at trial, Appellants renewed their objections to the entirety of her testimony, and specifically objected to any testimony about Thomas's "card campaign," an e-mail campaign asking everyone who received it to send a card to the victim's hospital room and to forward the e-mail to their friends. Defense counsel conceded that traditional humanizing testimony would be permissible. The Commonwealth agreed that the cards and letters Thomas solicited on the

6

victim's behalf should not be admitted into evidence, but argued Thomas should be able to testify about them.

The court ruled that the fact that Thomas read letters to the victim would be allowed, but that she would not be permitted to testify that this case garnered national attention or that people from around the nation sent letters to the victim. Specifically, the court said, "her testifying that this was national, and that everybody in the nation sent letters, that is where I'm gonna have to stop you." The Commonwealth then asked for the court to give it "a couple seconds just to tell [Thomas] where your cutoff is."

The defense further objected to any discussion of the quantity of the cards the victim received. The court concluded Thomas could testify about her observations of the victim's injuries and pain and suffering as a lay person could, and that she could testify about what she did with him, but she could not testify about what others did for him, including her card campaign and the number of cards the victim received.

Thomas began by describing how she came to hear about the attack on Clifton Agnew on the news, and how she decided to visit him in the hospital. She described the fact that his organs were still swollen outside of his body, and covered with clear surgical plastic.

The Commonwealth asked Thomas, "After you got back from the hospital that [first] day, what did you do?" She testified that she went home and e-mailed her friends, telling them of the "horrific thing" she had just seen, and

7

that the victim was a vegetable. Her e-mail requested her friends to send the victim a card for two reasons: First, "as an act of protest against the violence that had been done to him," and second, "as an act of kindness to show a man that probably had not had a lot of kindness in his life."

The Commonwealth then asked Thomas whether any of her friends who received her e-mail sent cards, and she responded that all twenty of them did. She continued by testifying that the following day he was sent seventy-five cards, and then 120, and so on. She testified that on one day, the victim received 666 cards, so she bought an extra card because she "thought he'd already met the devil once and he didn't need to meet him again." She then described how her initial e-mail was forwarded from her friends to their friends until the victim had received thousands of cards from all over the world, which she said she read to him one at a time.

While holding his hand, she "read to him these wonderful, magical cards that were all filled with love and compassion and hope and inspiration to someone who probably hadn't gotten a lot of cards in his life." She thought that as she read those cards to him, somehow there would be a connection between the sender of the letter and the victim, and that "somehow miraculously there would be some hope and maybe he would get better."

Directly contrary to the court's restriction on Thomas's testimony, the Commonwealth specifically asked, "How many cards did Clifton get after you sent out that first e-mail," and Thomas responded that he eventually received

6,286 cards. She described how the University of Louisville baseball team sent him a baseball, and how RCA Records, the Secretary of State of New Jersey, and a Native American tribe all sent him cards. She said that she found out that Agnew liked Elvis, and played Elvis music for him.

The Commonwealth then moved on and asked Thomas to describe the physical condition of the victim during the fifty-six days he was in a coma before dying. She replied that "there was never any reaction" from the victim, and also described his partial paralysis. She then testified that she became Agnew's legal guardian after he had been in a coma for over a month, and he was moved to a nursing home that volunteered to house him even though he was indigent. She found out where the victim was born, and located his ex-wife. Thomas described how Agnew had lost a tremendous amount of weight "because he had lost three-quarters of his stomach," and was on a feeding tube.

Thomas then specifically discussed the day the victim died in the nursing home, a day which she at first felt may have had "hope." She talked about how "for the very first time his eyes were opened, and they were opened just like my eyes are open right now." During all of her visits to see the victim, his eyes had always been brown when she peeled his eyelids open, but "on this day his eyes were sky blue" and she thought this was a good sign. She said she "really had hope that day," but nevertheless Agnew passed away that evening. Thomas testified for approximately eighteen minutes, and cried softly several times.

The Appellants made no objections during Thomas's heartfelt testimony. After she testified on direct examination, defense counsel moved for a mistrial. The court declined to make a "finding that the Commonwealth elicited the numbers and the extent" of the card campaign, and denied the motion for a mistrial, finding that because the physical condition and injuries of the victim were not in dispute, there was no prejudice from this testimony.

The Commonwealth argues that Thomas's testimony was appropriate as "humanizing" evidence, and to provide information about the victim's condition from the time he was attacked until the day he died. McQueen v. Commonwealth permits the prosecution to provide a humanizing witness, in order to show that the "victim was a living person, more than just a nameless void left somewhere on the face of the community" and more than just "a statistic." 669 S.W.2d at 523. See also Ernst v. Commonwealth, 160 S.W.3d 744, 763 (Ky. 2005) (quoting Bussell v. Commonwealth, 882 S.W.2d 111, 113 (Ky. 1994)) ("[A] certain amount of background evidence regarding the victim is relevant to understanding the nature of the crime."). This testimony has generally included basic background information about the victim. See, e.g., Hilbert v. Commonwealth, 162 S.W.3d 921, 926 (Ky. 2005) (mothers of victims briefly described dates of birth, number and sex of siblings, and the fact that one victim had a nine-year-old son); Hodge v. Commonwealth, 17 S.W.3d 824, 847 (Ky. 2000) (victims' sons testified that victims were elderly and infirm, that they worked hard to accumulate what was stolen, and that they attended

10

church on the day they were killed); Tamme v. Commonwealth, 973 S.W.2d 13, 35 (Ky. 1998) (mothers of victims introduced life photos of sons).

While humanizing evidence generally comes from family members, there is no rule limiting it to family members, nor should there be. Such a rule would limit humanizing evidence to those with families. This Court recognizes that, for victims with no family or friends, humanizing evidence may need to be presented differently. The fact that Mr. Agnew had no family does not make him any less entitled to evidence that he was more than just a statistic.

However, much of Thomas's testimony was evidence of the effect of the crime on others, and not mere victim background evidence. Such testimony exceeds the scope of what is allowed during the guilt phase:

> [W]hile the Commonwealth is entitled to show the jury that the victim was not a mere statistic, but a living person . . . we have expressed disapproval of the introduction of victim impact evidence during the guilt phase of a trial. . . . The reason, of course, is that such evidence is generally intended to arouse sympathy for the families of the victims, which, although relevant to the issue of penalty, is largely irrelevant to the issue of guilt or innocence. We reiterate that this type of evidence should be reserved for the penalty phase of the trial.

Bennett v. Commonwealth, 978 S.W.2d 322, 325-26 (Ky. 1998) (citations omitted).

Much of Thomas's testimony was not about the victim, but was instead about her reaction and the community's response to his plight, i.e. more akin to victim impact testimony. It is error to introduce victim impact evidence during the guilt phase of a criminal trial. See Ernst, 160 S.W.3d at 763. The

11

portions of Thomas's testimony that exceeded permissible humanizing evidence were error.

The question then becomes whether this error was harmless. RCr 9.24. A non-constitutional evidentiary error must have a substantial influence on the jury's verdict to require reversal. Winstead v. Commonwealth, 283 S.W.3d 678, 688-89 (Ky. 2009) (citing Kotteakos v. United States, 328 U.S. 750 (1946)).

Under the circumstances of this case, Thomas's testimony was harmless error. There is overwhelming evidence of the Appellants' guilt, including blood on the Appellants' clothing, DNA evidence linking the blood to Clifton Agnew, Hall's confession, and Hall's testimony at trial implicating both himself and Edmonds.

With regard to Thomas's testimony about Agnew's injuries, far more graphic evidence of these injuries was introduced through medical testimony and photographs shown to the jury. Upon consideration of the whole case, the improper victim impact-type testimony did not have a substantial influence on the jury's verdict. Those portions of Thomas's testimony that were error were therefore harmless error.

## 2.    Hearsay Testimony and Photo Array Identification

Larry Milligan was an eyewitness to the attack who did not testify at trial. He was homeless and it was believed he had left the state. On the morning of the attack, however, he gave a taped statement to Detective Jeff Wheeler and he identified Hall from a photo array. He then disappeared and was never

12

found. Because he failed to identify Edmonds, Edmonds sought to have the statements introduced as exculpatory evidence while Hall sought to keep the inculpatory hearsay identification out. The trial court granted Hall's written pretrial motion in limine to exclude any evidence about Milligan's statements because it was hearsay and violated his right to confront and cross-examine witnesses against him.

However, over Hall's objection, the trial court allowed Milligan to be discussed first in Dewayne Edmonds' opening statement,[4] saying that he saw two black men and identified Hall from a photo. Over Hall's renewed objection, the trial court later allowed Detective Gary Williamson and Detective Wheeler to repeat Milligan's hearsay statements about the men he saw in the alley, including Milligan's identification of Hall, and it allowed Detective Wheeler to say Milligan picked Hall out of a photo array (although the trial court did keep the actual array out). Additionally, Williamson testified as to double hearsay when he said he was told by other officers that Milligan was an eyewitness who had seen two men in the alley and that he had picked Hall out of a photo array. He also stated that he testified to the grand jury about what Milligan had said. An objection to the last comment on the grounds of hearsay was sustained by the trial court. At the close of the trial, Milligan had not been called to testify and Hall moved for a mistrial, which was denied.

---

[4] Dewayne Edmonds, the brother of Appellant Derek Edmonds, was a third co-defendant at this trial who pled guilty to second-degree robbery as the trial was ongoing, and thus he is not a party to this appeal.

13

The Commonwealth concedes these statements were hearsay. However, because Hall had confessed in multiple statements that he was present at the crime, though claiming varying degrees of involvement, there is no reasonable basis to believe that the statements had a substantial effect on the verdict against Hall, since they did little more than place him at the scene. The statements were actually favorable to Edmonds, who had wanted them admitted. Though error, it was harmless.

### 3.  Limitations on Individual Voir Dire

Appellants allege error in the trial court's limitation of the individual voir dire required in death penalty cases. Specifically, Appellants claim the trial judge abused her discretion by limiting their voir dire questioning of each prospective juror to two minutes each for the Commonwealth and the three defendants (before Dewayne Edmonds was dismissed), by limiting questions about possible mitigation evidence, and by limiting leading questions, thus denying their rights to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution. Contrary to Appellants' claims, however, the trial court properly exercised its discretion in conducting individual voir dire.

First, the voir dire questioning of the first juror took over twenty minutes. The trial court realized there were over one hundred prospective jurors remaining, and thus limited each party's questioning to two minutes. The jurors had already been shown a six-minute video presentation explaining the guilt and penalty phases of the trial, the penalty ranges for each defendant,

14

and aggravating and mitigating factors. Additionally, the trial court began individual voir dire by asking each prospective juror whether he or she had seen any media coverage or formed an opinion about the case. The judge then referenced a chart showing the range of possible penalties and asked each juror whether he or she could consider the full range of penalties if selected to serve and deliberate in the penalty phase, including the twenty-year minimum penalty and the maximum penalty of death. The Appellants also had each juror's response to the death penalty qualification questionnaire. Therefore, before Appellants even began their questioning, the primary issues for individual voir dire had already been addressed and the Appellants already had a response by each juror to key issues. Given the multitude of information the Appellants already had for each juror, the trial court's two-minute limitation was permissible. "The mere fact that more detailed questioning might have somehow helped the accused in exercising peremptory challenges does not suffice to show abuse of the discretion in conducting the examination." Woodall v. Commonwealth, 63 S.W.3d 104, 116 (Ky. 2001).

Appellants do not cite a case in which a two-minute limit in individual voir dire was error. The authority from other jurisdictions cited in Appellants' reply briefs is readily distinguishable. Several of those cases involved excessive limits on overall voir dire,[5] where no such limit existed in this case, or

---

[5] See State v. Strange, 619 So.2d 817 (La. Ct.App. 1993) (error to limit overall voir dire to ten minutes); McCarter v. State, 837 S.W.2d 117 (Tex. Crim. App. 1992) (error to limit overall voir dire to 30 minutes).

15

limitations that were not even enforced.[6] The other cases involve limits on individual voir dire.[7] Those cases, however, involved much more stringent limits than here. Ultimately, the voir dire of each juror here, which, counting the video and questioning, was at least 14 minutes per juror, was far greater than that found wanting in other jurisdictions. Additionally, Appellants' cited authority is not binding in Kentucky, and this Court concludes that the two-minute-per-defendant limit in individual voir dire was not an abuse of discretion under the facts of this case.

Second, the trial judge only permitted a generalized inquiry into mitigation. Under <u>Woodall</u>, however, this was also a permissible exercise of the trial court's discretion. In that case, "[Appellant] Woodall sought to question the jury about specific mitigating circumstances rather than a generalized inquiry as allowed by the trial judge." <u>Woodall</u>, 63 S.W.3d at 116. This Court held that because "[t]he judge permitted Woodall to question jurors extensively regarding mitigating circumstances so long as the questions were general and did not inquire into specific mitigation," the trial court in that case did not abuse its discretion. <u>Id</u>. In this case, after the Commonwealth objected to defense counsel's attempt to ask questions about specific mitigating

---

[6] <u>See</u> <u>People v. Odle</u>, 754 P.2d 184 (Cal. 1988). Since the limit in that case was not enforced, it is unclear why Appellants even cite it.

[7] <u>See</u> <u>Clemments v. State</u>, 940 S.W.2d 207 (Tex. Ct.App. 1996) (one-hour overall limit on <u>voir dire</u> was unreasonable where 30 minutes was used to question entire panel, leaving approximately 30 seconds per juror to individually question 60 venire members); <u>O'Hara v. State</u>, 642 So.2d 592 (Fla. Dist. Ct.App. 1994) (abuse of discretion to limit voir dire of 24 jurors to 40 minutes); <u>State v. Williams</u>, 860 P.2d 860, 863 (Or. Ct. App. 1993) (error to limit voir dire of 25 jurors to 40 minutes, about 96 seconds per panel member).

16

circumstances, the judge gave counsel a mitigation definition that they could tell the jurors, and she reminded counsel that her video presentation had explained to the jurors what mitigation evidence was. As in Woodall, because Appellants were allowed to ask about mitigation generally, "[i]t was not an abuse of discretion by the trial judge to restrict the voir dire . . . concerning specific mitigation evidence which [they] planned to present." Id. Not only did the judge not abuse her discretion, but what the Appellants' counsel asked to do has been held to be impermissible: "[A]sking potential jurors how they would weigh specific mitigating circumstances would ignore well-settled precedent that it is impermissible to ask voir dire questions designed to commit jurors to certain theories." Sherroan v. Commonwealth, 142 S.W.3d 7, 14 (Ky. 2004).

Finally, the trial court restricted Appellants' leading questions. Defense counsel, however, was attempting to use hypothetical scenarios to pin down jurors on a specific penalty phase decision, without referencing any specific evidence. This sort of questioning violates the proscription against questions designed to commit jurors to certain theories, as noted in Sherroan. Moreover, this Court has recognized:

> "It is well (sic) to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed. . . . Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. . . ."

17

Penman v. Commonwealth, 194 S.W.3d 237, 251 (Ky. 2006) (quoting Patton v. Yount, 467 U.S. 1025, 1039 (1984)). Due to defense counsels' attempts to have jurors commit to specific penalties when given hypothetical scenarios, "[t]he trial court correctly limited defense counsel's questioning when it became clear that jurors found the inquiry confusing." Furnish v. Commonwealth, 95 S.W.3d 34, 44 (Ky. 2002).

Therefore, the individual voir dire in this case fits within the well-established rule that "[t]he trial judge has broad discretion in the area of questioning on voir dire." Ward v. Commonwealth, 695 S.W.2d 404, 407 (Ky. 1985).

### 4. For-Cause Challenges to Jurors

Appellants claim the trial court erred in denying several for-cause challenges to jurors and in improperly striking some jurors for cause.[8] The Appellants exhausted their peremptory challenges and thus this issue is preserved. See Shane v. Commonwealth, 243 S.W.3d 336, 340-41 (Ky. 2007) (" 'When a defendant does exhaust all of his peremptory challenges, he has been denied the full use of his peremptory challenges by having been required to use peremptory challenges on jurors who should have been excused for cause.' " (quoting Thomas v. Commonwealth, 864 S.W.2d 252, 259 (Ky. 1993))).

This Court reviews a trial court's determination regarding the exclusion of a juror for cause for an abuse of discretion. Fugett v. Commonwealth, 250

---

[8] Several jurors' responses have been attacked on multiple grounds, requiring more than one for-cause analysis for each, thus these responses are discussed more than once below.

S.W.3d 604, 613 (Ky. 2008). "[T]he decision to exclude a juror for cause is based on the totality of the circumstances, not in response to any one question." Id. "The test for determining whether a juror should be stricken for cause is 'whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.' " Thompson v. Commonwealth, 147 S.W.3d 22, 51 (Ky. 2004) (quoting Mabe v. Commonwealth, 884 S.W.2d 668, 671 (Ky. 1994)); see also RCr 9.36(1).

Juror 160394 said that on the morning of her voir dire she had seen part of a television report about the case, but that she had not formed any firm opinions on the case, though she noted during her lengthy individual voir dire (lasting over twenty minutes)[9] that her initial opinion was that the Appellants were probably guilty. When she said, "If the police found enough evidence to bring them to trial then I would assume that it would be likely" that they are guilty, she was essentially describing what amounted to a layperson's (largely correct) understanding of probable cause to bring charges. Moreover, she repeatedly asserted that she could put any previous opinions aside and would have to first consider the evidence before making a final decision, and she responded that she could consider the entire range of penalties.

" '[I]n order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside, requiring the juror

---

[9] The length of Juror 160394's individual voir dire prompted the trial judge to impose the two-minute limitation.

to decide a case one way or the other . . . . The Constitution does not require ignorant or uninformed jurors; it requires impartial jurors.' " Furnish, 95 S.W.3d at 45 (quoting McQueen v. Scroggy, 99 F.3d 1302, 1319-20 (6th Cir. 1997)). The trial court did not abuse its discretion when it found Juror 160394 was able to set aside any impression she may have had from the news report.

Jurors 155059, 152182, 155132, 146941, 153474, 156261, 148992, 150450, 161976, and 162784, in response to hypothetical scenarios posited by the defense, responded that they could not consider lesser penalties such as twenty years under the specific scenarios. The trial judge, however, did not strike these jurors because she found that from the totality of their answers they could in fact consider the full range of penalties. "The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading." Mabe, 884 S.W.2d at 671. Disqualification of these jurors was not warranted.

Jurors 146941 and 161305 both said they could consider the full range of penalties, even though they said they were more likely to impose a harsher punishment. "[E]xcusal for cause is not required merely because the juror favors severe penalties, so long as he or she will consider the full range of penalties." Id. at 119. Disqualification of these jurors was not warranted.

During the voir dire of Jurors 153641, 145910, 146941, 149216, and 163414, the defense attempted to ask questions regarding specific types of mitigation. Again, "asking potential jurors how they would weigh specific

20

mitigating circumstances would ignore well-settled precedent that it is impermissible to ask voir dire questions designed to commit jurors to certain theories." Sherroan, 142 S.W.3d at 13-14. Disqualification was not warranted.

Juror 149359 had previously worked in the United States Attorney's Office, was married to a Louisville Metro Police Department officer, and she currently worked for a law firm. "[T]he party alleging bias bears the burden of proving that bias and the resulting prejudice." Cook v. Commonwealth, 129 S.W.3d 351, 357 (Ky. 2004). Once this is shown, "[t]he court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor." Shane, 243 S.W.3d at 338. This juror's previous employment, her husband's employment, and her current employment, standing alone, are connections too tenuous to constitute the "close relationship" required to presume bias or prejudice. Montgomery v. Commonwealth, 819 S.W.2d 713 (Ky. 1991); but see Marsch v. Commonwealth, 743 S.W.2d 830, 833 (Ky. 1987) (close relationship existed where two potential jurors were married to victim's second and third cousins, visited funeral home to express condolences to victim's family, and one juror had known victim since he was a teenager and worked with him in church). Because the close relationship was not established, Juror 149359 could be qualified, and disqualification was not warranted.

Jurors 161911 and 151644 said they could not impose the death penalty. As a result, the judge struck them, which Appellants claim was

improper. However, "[d]eath qualification of jurors is not unconstitutional." Caudill v. Commonwealth, 120 S.W.3d 635, 678 (Ky. 2003). These jurors were properly disqualified.

**B.      Issues Raised Solely by Derek Edmonds**

### 1.      Comparison to Jesus in Guilt Phase Closing Argument and Examples of Worse Cases in Penalty Phase Closing Argument

Edmonds claims it was error for the trial court to sustain objections to his attempts to compare himself to Jesus being put to death on the cross and to "worse" cases like Jack the Ripper, Jeffrey Dahmer, and John Wayne Gacy.

As to the comparison to Jesus, Edmonds claims his First Amendment right to free exercise of religion was violated. Yet, given the direction his attorney was headed, and the fact that this was a closing argument rather than a church service, it is clear that he did not wish to engage in any sort of religious worship or ceremony, and thus this was clearly not an issue of the free exercise of religion.

Generally, "[i]t is unquestionably the rule in Kentucky that counsel has wide latitude in making opening or closing statements." Brewer v. Commonwealth, 206 S.W.3d 343, 350 (Ky. 2006). However, trial courts retain the sound discretion to limit closing arguments when necessary. While it may not have been necessary to restrict Edmonds' counsel as to these topics, there is also little conceivable benefit to Edmonds from such comparisons. Certainly, it is not likely that their omissions had a substantial effect on the verdict. If

22

error, it was harmless.

## 2. Full Access to Hall's Psychiatric Condition

Edmonds claims that he was improperly denied full access to Hall's psychiatric records and an independent psychiatric examination, and that he therefore could not adequately impeach Hall with his own psychiatric history. Even though many of Hall's psychiatric records were contained in juvenile records that the trial court ruled were discoverable by the co-defendants, Edmonds objects that he was not permitted to delve even further into Hall's psychiatric history. However, after a review of Hall's records that Edmonds did have, this Court finds it would have been unnecessary to compel the disclosure of additional records.

Kentucky follows the majority rule that "a criminal defendant, upon a preliminary showing that the records likely contain exculpatory evidence, is entitled to some form of pretrial discovery of a prosecution witness's mental health treatment records that would otherwise be subject to an 'absolute' privilege." Commonwealth v. Barroso, 122 S.W.3d 554, 561 (Ky. 2003).

> If the psychotherapy records of a crucial prosecution witness contain evidence probative of the witness's ability to recall, comprehend, and accurately relate the subject matter of the testimony, the defendant's right to compulsory process must prevail over the witness's psychotherapist-patient privilege. Upon a preliminary showing . . . the witness's psychotherapy records are subject to production for an in camera inspection to determine whether the records contain exculpatory evidence, including evidence relevant to the witness's credibility.

Id. at 563.

23

In Barroso, however, this Court was cognizant that a "more restrictive test is required to preclude 'fishing expedition[s] to see what may turn up.'" Id. (quoting Bowman Dairy Co. v. United States, 341 U.S. 214, 221 (1951)). Therefore, an "in camera review of a witness's psychotherapy records is authorized only upon receipt of evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence." Id. at 564. After examining Hall's juvenile records in camera—which contained some of his psychiatric records that were five to ten years old—the trial judge found that an in camera review of the rest of his records was not warranted. The judge specifically found that the information in Hall's juvenile file from years before the current case was not sufficient evidence under Barroso to establish the required reasonable belief that the records contain exculpatory evidence.

> A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem. To subject every witness in a criminal prosecution to an in camera review of their psychotherapist's records would be the invasion of privacy which the psychotherapist-privilege is intended to prevent.

Id. at 563 (quotation marks and citations omitted). Under these circumstances, the trial judge did not abuse her discretion.

As to Edmonds' request for an independent psychiatric examination of Hall pursuant to CR 35.01—made applicable to criminal proceedings by RCr 13.04, St. Clair, 140 S.W.3d at 542—"good cause" must be shown to warrant such an examination. For the same reasons that the trial judge did not find the required reasonable belief that Hall's psychiatric records contained

24

exculpatory evidence, the trial judge did not abuse her discretion by declining to order an independent psychiatric examination.

### 3. Competency to Stand Trial and Serious Mental Retardation

Edmonds also claims that he should have been found incompetent to stand trial and found to be mentally retarded so as to exclude the possibility of the death penalty. Before the trial in this case, the trial court conducted a competency hearing. Dr. Peter Schilling testified for the defense and Dr. Steven Simon testified after conducting a competency evaluation at the Kentucky Correctional Psychiatric Center ("KCPC") at the court's request.

Dr. Schilling conceded that Edmonds recorded a full-scale I.Q. score of 71 on the test he administered, and that he had previously scored 71 and 73. He also conceded that Edmonds achieved scores indicative of malingering.

Dr. Simon testified that Edmonds scored 66 on the test administered at KCPC but that he once again achieved scores indicative of malingering.

"RCr 8.06 and KRS 504.100 set out the legal duty to order a competency hearing once reasonable grounds are presented which call competency into question." Alley v. Commonwealth, 160 S.W.3d 736, 739 (Ky. 2005). The trial judge did this. At this hearing, however, "[t]he burden is on the defense to prove a defendant incompetent by a preponderance of the evidence." Id. "In Kentucky, the standard of competency is whether the defendant has a substantial capacity to comprehend the nature and consequences of the proceedings against him and to participate rationally in his defense." Id.; see

<u>also</u> KRS 504.060. The trial judge noted this standard in reaching her decision.

"The mere fact that the trial judge accepted the testimony of one of the doctors as more credible than the other, has been found to be permissible and allows the judge to make a finding regarding competency." <u>Alley</u>, 160 S.W.3d at 739. The situation here is on point with <u>Alley</u>, where

> the trial judge had the authority to accept the medical evidence that he believed was most credible and convincing. He made extensive findings of fact with regard to the evidence and determined that Alley had failed to provide sufficient evidence to demonstrate that he was incompetent to stand trial in light of the evidence to the contrary. Our review of the record indicates that the decision of the trial judge was supported by substantial evidence and was not clearly erroneous.

<u>Id</u>. Here, the trial judge weighed the two evaluations and found that Edmonds had been malingering. She did not abuse her discretion by finding him competent to stand trial at that time.

Additionally, Edmonds argues he should have been found mentally retarded and thus been exempt from the death penalty under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), and KRS 532.140. Because Edmonds did not receive the death penalty, this issue is moot.

### 4.    Improper Sentence for First-Degree Sodomy

The trial court's Judgment of Conviction and Sentence lists Edmonds' sentence for first-degree sodomy as life without benefit of parole. The jury, however, recommended a sentence of life, which is also reflected in the

26

Judgment on Jury Trial entered just after the trial but before final sentencing. The Judgment of Conviction and Sentence gives Edmonds an impermissible sentence for first-degree sodomy. In this case, the sodomy was a Class A felony, KRS 510.070, the penalty range for which is 20 to 50 years' or life imprisonment, KRS 532.060(2). This issue was not raised by Appellant, but has been revealed in review of the record. To the extent that the final Judgment reflects an impermissible sentence, it must be reversed and remanded to the trial court for entry of an amended judgment reflecting the life sentence fixed by the jury and contained in the trial judgment.

## C. Issues Raised Solely by Tyreese Hall

### 1. Initial Confession and Failure to Readvise of Miranda Rights

Hall claims his two statements to police confessing to the attack should have been suppressed. Hall gave his first statement to police on April 6, 2004, the day of the attack, after he signed a waiver of his <u>Miranda</u> rights. On April 16, 2004, he was arraigned and appointed counsel, who then, as he describes in his brief, "asserted" his <u>Miranda</u> rights.

Three and one-half months later, Hall initiated telephone contact with the police and gave a second statement. Detective Williamson told Hall, "When I originally brought you in, I advised you of your rights. Do you remember that?" Hall said, "Yes." Detective Williamson then said, "So you're waiving those rights and the right to an attorney, and you've been arraigned on this assault charge, right." Hall again answered, "Yes."

However, the trial court entered an order finding that Hall was "a seriously mentally retarded defendant as defined by KRS 543.130 and . . . meets the criteria for a retarded person under <u>Atkins v. Virginia</u>," and that he was excluded from the death penalty.

As for his first statement to police, Hall argues that under the totality of the circumstances approach, his serious mental retardation rendered his initial confession involuntary and it should have been suppressed. "The Due Process Clause of the Fourteenth Amendment prohibits the admission of involuntary confessions: '[if the defendant's] will has been overborne and his capacity for self-determination critically impaired, the use of [the] confession offends due process.' " <u>Bailey v. Commonwealth</u>, 194 S.W.3d 296, 300 (Ky. 2006) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225-26 (1973)) (alterations in original). "The voluntariness of a confession is assessed based on the totality of the circumstances surrounding the making of the confession." <u>Mills v. Commonwealth</u>, 996 S.W.2d 473, 481 (Ky. 1999).

The Commonwealth bears the burden of establishing voluntariness by a preponderance of the evidence. <u>Bailey</u>, 194 S.W.3d at 300. Voluntariness first turns on the presence or absence of coercion by police. <u>See id.</u> (" '[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.' ") (quoting <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986)). But the " 'ultimate test' of the voluntariness of a confession" is whether " 'the

confession [is] the product of an essentially free and unconstrained choice by its maker[.]' " Bailey, 194 S.W.3d at 300 (quoting Schneckloth, 412 U.S. at 225).

In undertaking the voluntariness assessment, " 'both the characteristics of the accused and the details of the interrogation are considered.' " Bailey, 194 S.W.3d at 300 (quoting Schneckloth, 412 U.S. at 226).

> When examining the characteristics of the accused, reviewing courts consider such factors as age, education, intelligence, and linguistic ability. . . . Factors relevant to a characterization of the interrogation include the length of the detention, the lack of any advice to the accused concerning his constitutional rights, the repeated or prolonged nature of the questioning, and the use of overtly coercive techniques such as the deprivation of food or sleep, or the use of humiliating tactics.

Bailey, 194 S.W.3d at 300-301 (citation omitted).

Finally, "[t]his Court has succinctly summarized the relevant inquiry to determine voluntariness as follows: '(1) whether the police activity was "objectively coercive"; (2) whether the coercion overbore the will of the defendant; and (3) whether the defendant showed that the coercive police activity was the "crucial motivating factor" behind the defendants' confession.' " Id. at 301 (quoting Henson v. Commonwealth, 20 S.W.3d 466, 469 (Ky. 1999)).

Hall's interrogation with police began less than an hour after he was arrested, and it lasted just over an hour. Hall was also read his Miranda rights and signed a waiver form. He almost immediately confessed. He was not deprived of food, sleep, or medical attention. While he was found to be

29

mentally retarded, his recorded IQ scores were higher than those of the defendant in <u>Bailey</u>. Hall also reads at a second-grade level, attended special education classes into the eleventh grade, and had prior contact with law enforcement. He was found to be competent to stand trial.

"Appellant's mental retardation is a <u>factor</u> to consider in assessing the voluntariness of a confession, but 'the mere existence of a mental condition, by itself and apart from its relation to police coercion, does not make a statement constitutionally involuntary.' " <u>Rogers v. Commonwealth</u>, 86 S.W.3d 29, 37 (Ky. 2002) (quoting <u>Lewis v. Commonwealth</u>, 42 S.W.3d 605, 612 (Ky. 2001)). Early in Hall's interrogation, Detective Williamson asked him, "[D]o you feel deep down in your soul that there's something you need to talk to me about?" Hall told him that he did not know how it all happened, and he then admitted he swung and hit the victim and that was why his hand was swollen. This was the initial confession, and as the interrogation went on, the record demonstrates that the detective did in fact take special care not to be overly solicitous of further incriminating statements. While the detective did go on to tell Hall, "I know already," presumably a ruse to convince Hall that he already knew all the details of the crime, Hall had already confessed to many of those details. "[T]he 'employment of a ruse, or "strategic deception," does not render a confession involuntary so long as the ploy does not rise to the level of compulsion or coercion.' " <u>Rogers</u>, 86 S.W.3d at 37 (quoting <u>Springer v. Commonwealth</u>, 998 S.W.2d 439, 447 (Ky. 1999)). For the most part, the

detective proceeded by pulling Hall along and asking him to just go one step further and to tell him some more.

Under "the totality of the circumstances surrounding the making of the confession," Mills, 996 S.W.2d at 481, including Hall's mental retardation, this Court finds there was nothing "inherently or objectively coercive about the interrogation in this case," Rogers, 86 S.W.3d at 37, and that his initial statement was made voluntarily. Therefore, the trial court properly denied Hall's motion to suppress this statement.

Hall also argues the second statement he gave to Detective Williamson should have been excluded. Hall initiated telephone contact with Detective Williamson, who asked Hall if he remembered his rights from the first interrogation three and one-half months before, and specifically his right to counsel, and whether he was again waiving them. Hall said he was.

The Supreme Court "has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant . . . . Quite the contrary, Miranda itself indicated that no talismanic incantation was required to satisfy its strictures." California v. Prysock, 453 U.S. 355, 359 (1981). "Reviewing courts therefore need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.' " Duckworth v. Eagan, 492 U.S. 195, 203 (1989) (quoting Prysock, 453 U.S. at 361) (alterations in original). Detective Williamson's

31

asking Hall if he remembered his rights from when they were read to him before, specifically his right to counsel, and whether he was again waiving them, did not render his statement involuntary under <u>Miranda</u>. Even though the second statement was three and one-half months after his initial interrogation and reading of his <u>Miranda</u> rights, under the circumstances—given that Hall initiated contact with the detective and told him he remembered his rights, specifically his right to counsel, and that he was once again waiving his rights—the trial court properly denied Hall's motion to suppress this statement as well.

### 2. Admission of Gruesome Photos of Victim's Injuries

Hall claims the eight photos of the victim identified by Dr. Bill Smock, an emergency room physician at the University of Louisville, should have been excluded. He also claims it was error to allow Dr. Smock to use a chart to describe the victim's injuries and for him to demonstrate with one of the prosecutors the length of the stick used in the sodomy in relation to a person's back.

The photos at issue and the exhibition by the doctor were admissible. " 'The rule prohibiting the exhibition of inflammatory evidence to a jury does not preclude the revelation of the true facts surrounding the commission of a crime when these facts are relevant and necessary.' " <u>Adkins v. Commonwealth</u>, 96 S.W.3d 779, 794 (Ky. 2003) (quoting <u>Salisbury v. Commonwealth</u>, 417 S.W.2d 244, 246 (Ky. 1967)). "The general rule is that a

32

photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." Funk v. Commonwealth, 842 S.W.2d 476, 479 (Ky. 1992). "Were the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive." Adkins, 96 S.W.3d at 794 (quoting Salisbury, 417 S.W.2d at 246). Even though the defense did not contest that the victim suffered terrible injuries, "the prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see." Barnett v. Commonwealth, 979 S.W.2d 98, 103 (Ky. 1998). The number of photos was not excessive, they were not unduly redundant, and admission of these photos and the exhibition by the doctor were not error.

### 3. Joint Trial and Penalty Phase

Hall claims he should have received a separate trial without a death-qualified jury, since the trial judge ruled he was ineligible for the death penalty due to his serious mental retardation. However, "[i]n a joint trial for capital murder where the death penalty is sought against one defendant, but not the other, the impaneling of a death-qualified jury does not deprive the defendant of the right to a trial by a fair and impartial jury selected from a fair cross-section of the community." Buchanan v. Commonwealth, 691 S.W.2d 210, 211 (Ky. 1985). In Buchanan, this Court rejected the specific argument raised by Hall:

33

[The] contention that death qualification excludes a cognizable group from the jury panel so as to make it unrepresentative of a fair cross-section of the community is also unconvincing. Persons who are unalterably opposed to capital punishment do not constitute a cognizable group for the purpose of the fair cross-section requirement. Such persons have diverse attitudes which defy classifications and have not been singled out by the public for special treatment. They do not meet the criteria for making a cognizable class . . . . It was not reversible error to death-qualify the jury.

Id. at 212.

More generally, "[t]he trial judge has broad discretion in determining whether to grant separate trials and his/her decision in that regard will not be overturned absent a showing of prejudice to the defendant and a clear abuse of discretion by the judge." Taylor v. Commonwealth, 995 S.W.2d 355, 360 (Ky. 1999). Given the clear state of the law on joint trials in death penalty cases, the trial judge did not abuse her discretion by declining to order separate trials.

Additionally, Hall argues that the trial court should have ordered separate penalty phases because evidence against Edmonds, against whom the Commonwealth sought the death penalty, would have prejudiced Hall. In making this claim he relies on Foster v. Commonwealth, 827 S.W.2d 670 (Ky. 1991), where this Court held that the mitigation evidence as to Foster's co-defendant, Powell, was so prejudicial to Foster as to require reversal of her sentence. Specifically, Powell claimed "duress and domination" by Foster and introduced evidence that Foster threatened her and that Foster had said that she had to kill one of the victims because Powell was a "weak bitch" and "not

capable of finishing the work." Id. at 681. Additionally, Powell and Foster had a long-term lesbian relationship, and Powell testified that she had been beaten by Foster and that Foster had perpetrated other acts of violence against members of her own family. Id. Powell also introduced expert testimony that her relationship with Foster had "similar characteristics" to "battered spouse syndrome" because she had "learned helplessness" toward Foster. Id. at 683.

In this case, however, Edmonds' four mitigation witnesses did not even mention Hall. Edmonds did not testify in the penalty phase, and he offered no evidence of prior misconduct by Hall. A separate penalty phase for Hall was not required, and the trial judge did not abuse her discretion.

### 4. Jury Instructions

#### a. Extreme Emotional Disturbance

Hall claims that he was entitled to an instruction on extreme emotional disturbance ("EED") as another route to the lesser-included offense of first-degree manslaughter. The evidence simply did not support an EED instruction.

> Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefore, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

McClellan v. Commonwealth, 715 S.W.2d 464, 468-69 (Ky. 1986).

Hall testified he was startled when the victim in this case rose up in a dark alley. He did not testify that he was so enraged, inflamed, or disturbed as to be uncontrollable, and being merely startled was not a reasonable explanation or excuse for killing the victim in this case. No other evidence showed such a response in him. Therefore, the trial court did not err in failing to give an instruction on EED.

### b. Second-Degree Manslaughter

Hall also claims that he was entitled to a jury instruction on second-degree manslaughter. At trial, Hall tendered a proposed instruction on second-degree manslaughter, based in part on the proposed murder instruction which allowed a finding of guilty on either intentional or wanton murder. The trial judge denied the motion, finding no reasonable basis for the instruction because she believed the evidence showed at least a clear intent to injure, and thus the only possible lesser-included offense was first-degree manslaughter.

The Penal Code commentary illustrates the difference between wanton murder and second-degree manslaughter:

> The two offenses described by these provisions, [wanton] murder by KRS 507.020(1)(b) and manslaughter in the second degree by KRS 507.040, have three elements in common: the conduct in question must have involved a substantial and unjustifiable risk of death to human life; the defendant, in causing the death in question, must have consciously disregarded that risk, and his disregard must have constituted "a gross deviation from the standard of conduct that a reasonable person would [have observed] in the situation." Taken together, these three elements constitute the culpable mental state defined in KRS 501.020 as

36

"wantonness," and without more, will suffice for a conviction of manslaughter in the second degree. If accompanied by a fourth element, i.e., "circumstances manifesting extreme indifference to human life," they are sufficient for a conviction of [wanton] murder.

KRS 507.020 cmt.[10]

"An instruction on a lesser-included offense is required only if, considering the totality of the evidence, the jury could have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." Baker v. Commonwealth, 130 S.W.3d 90, 94 (Ky. 2003) (citing Clifford v. Commonwealth, 7 S.W.3d 371, 377-78 (Ky. 1999); Bills v. Commonwealth, 851 S.W.2d 466 (Ky. 1993)).

In most cases involving wanton killings, the evidence is such that a jury could reasonably find wantonness with or without extreme indifference, and a wanton murder instruction should be accompanied by an second-degree manslaughter instruction. See, e.g., Parker v. Commonwealth, 241 S.W.3d 805 (Ky. 2007) (defendant opened fire into a car); Ward v. Commonwealth, 695 S.W.2d 404 (Ky. 1985) (testimony in murder trial that the plan was only to shoot out victim's tires, and defendant shouted that the gun got away from

---

[10] A defendant is guilty of wanton murder when, "under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020(1)(b).

A person acts wantonly "when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." KRS 501.020(3).

him). However, this case presents the rare situation where the attack was so incredibly brutal that, if the jury believes the facts presented, the act must be either intentional, or wanton with extreme indifference to human life (i.e. aggravated wantonness, supporting a wanton murder conviction).

Based on Hall's own testimony, Hall was present for the entirety of the attack, beginning with the kicking and hitting of the victim with a crock pot, and continuing through sodomizing him with a 27-inch stick that extended into his lungs. Hall either impaled Clifton Agnew with a stick and bottle, or watched as Edmonds did. At the very least, Hall stood idly by while an unconscious man was beaten further and brutally sodomized. As a principal and/or complicitor, Hall is responsible for the ultimate act, and the attack must be judged as a whole. Under these circumstances, there was no error in refusing to instruct the jury on second-degree manslaughter. See Cecil v. Commonwealth, 888 S.W.2d 669, 674 (Ky. 1994) (no error in instructing on wanton murder but not second-degree manslaughter when defendant shot victim at point blank range, even though defendant claimed the gun "went off"); Crane, 833 S.W.2d at 817-18 (no error in instructing on wanton murder but not second-degree manslaughter when defendant shot store clerk at close range, even though defendant claimed he shot "straight up in the air").

c.    **Complicity**

Hall argues that the trial court gave an erroneous complicity instruction. KRS 502.020 creates two types of complicity: complicity to the act under

subsection (1), and complicity to the result under subsection (2):

> When causing a particular result is an element of an offense, a person who acts <u>with the kind of culpability with respect to the result that is sufficient for the commission of the offense</u> is guilty of that offense when he:
>
> (a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or
>
> (b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or
>
> (c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

KRS 502.020(2) (emphasis added).

The Definitions section of Hall's jury instructions defined each type of complicity separately. Hall argues that the "Complicity as to a Criminal Result" definition should have included the mental state of "intentional." This Court held in <u>Harper v. Commonwealth</u> that "subsection (2) complicity liability is not limited to non-intentional mental states." 43 S.W.3d 261, 267 (Ky. 2001). Therefore, an intentional mental state could have been included as a possible mental state for conviction of subsection (2) complicity, but it was not necessary, because Hall was also charged with wanton murder.

### d. First-Degree Sodomy

Hall claims the jury was improperly instructed that it could convict Hall of sodomy only if it believed that he, acting alone or in complicity, engaged in deviate sexual intercourse with the victim in this case. Hall bases his argument on the definition of deviate sexual intercourse provided in the

39

instructions, which was consistent with the definition provided in KRS 510.010(1): " 'Deviate sexual intercourse' means any act of sexual gratification involving the sex organs of one person and the mouth or anus of another; or penetration of the anus of one person by a foreign object manipulated by another person." Hall asserts that there was no act of sexual gratification, and he contends that "act of sexual gratification" modifies both parts of this definition. However, it is clear from the plain language of the statute that contrary to Hall's assertion, the two phrases are separated by the word "or," and that the second phrase, "penetration of the anus of one person by a foreign object manipulated by another person," need not be done for sexual gratification. The instruction was proper.

### e.     Penalty Phase Instructions

Hall's final claims are that his verdict form directed a verdict of life without the benefit of probation or parole for twenty-five years, and that the aggravating circumstances instruction was improper.

In support of his first claim, Hall points to Verdict Form Nos. 1 through 3, which arguably imply that if the jury found Hall guilty of an aggravator, then they could only fix his punishment at life without the benefit of probation or parole for twenty-five years. However, Hall conveniently failed to cite Instruction No. 6, which specifically says "You do not have to sentence the Defendant, TYREESE HALL, to a term of imprisonment for life without benefit of probation or parole until he has served a minimum of 25 years of his

40

sentence <u>even if you find the aggravating circumstances stated in these</u> <u>Instructions were proven beyond a reasonable doubt.</u>" (Emphasis added). After a review of the instructions contained in the record, Hall's attempt to mislead the Court fails. This argument is without merit.

However, the judge also gave the following instruction during the penalty phase:

> In fixing a sentence for the Defendant, TYREESE HALL, for the offenses of the Murder, Robbery in the First Degree, and Sodomy in the First Degree of Clifton Agnew, you shall consider the following aggravating circumstances which you may believe from the evidence beyond a reasonable doubt to be true . . . .

Such an instruction improperly includes Robbery in the First Degree and Sodomy in the First Degree as offenses for which aggravating circumstances instructions may be found, thus Appellants argue that the jury might enhance the punishment for the robbery and sodomy, as well as the murder, under the aggravating circumstances in death penalty cases statute, KRS 532.025(2)(a).

As to whether this taints Hall's sentences for robbery and first-degree sodomy, the Court concludes that any error was harmless. Though those offenses were improperly included under the general aggravator instruction, the specific penalty instructions and verdict forms for those crimes include no room for the use of aggravating factors, listing instead only the statutory penalty ranges (10 to 20 years for the robbery, 20 to 50 years or life for the first-degree sodomy). Aggravating factors only go to whether the death penalty, life without benefit of probation or parole, or life without benefit of probation or

parole for 25 years are options, and the instructions informed the jury that those sentences need not be imposed even if an aggravating circumstance was found.

## IV. CONCLUSION

The judgment of the Jefferson Circuit Court is hereby affirmed. However, with respect to Appellant Derek Edmonds, we reverse and remand for the limited purpose of entry of an amended judgment on his sodomy conviction stating that he received a sentence of life, and not a sentence of life without parole.

All sitting. Abramson, Cunningham, Schroder, Scott, and Venters, JJ., concur. Noble, J., dissents by separate opinion, in which Minton, C.J., joins.

NOBLE, J., DISSENTING: I respectfully dissent as to the majority holdings that the erroneous admission of Kay Thomas's testimony was harmless error and that the appellants were not entitled to an instruction on second-degree manslaughter as a lesser-included offense.

## I. Kay Thomas's Testimony and Harmless Error

The majority agrees that much of Thomas's testimony was improper and exceeded the scope of allowable humanizing evidence. This means it was victim impact testimony which could not properly be given in the Commonwealth's case in chief, if at all, because Thomas did not qualify to give such testimony as she was not among the statutorily eligible witnesses for victim impact testimony. Additionally, the record indicates that much of her

42

testimony was given even though the trial court had expressly ruled that she could not testify on those issues. Yet the majority concludes that this erroneous testimony—which included describing an international card campaign expressing outrage over the crime; saying that the victim had "met the devil" at the hands of the appellants; graphically describing his injuries and how she sat and held his hand; describing conversations with the victim's ex-wife; and saying that his brown eyes turned blue on the day he died, among other non-substantive comments—was harmless because the evidence of guilt was otherwise overwhelming, meaning that the erroneous testimony had no influence on the verdict. I cannot join this conclusion.

Over the years, we have struggled with how to apply the harmless error rule, RCr 9.24, to non-constitutional errors.[11] At times, we have employed a guilt-based test that focuses on whether the result would have been different absent the error, usually by looking at whether the evidence other than that erroneously admitted was overwhelming (and in some outliers, merely "sufficient" for a guilty verdict). See, e.g., Brewer v. Commonwealth, 206 S.W.3d 313, 324-25 (Ky. 2006); Taylor v. Commonwealth, 175 S.W.3d 68, 72 (Ky. 2005); Abernathy v. Commonwealth, 439 S.W.2d 949, 952 (Ky. 1969). In other cases, we have looked at whether the error had any effect on, or

---

[11] The standard for constitutional errors has been set by the United States Supreme Court. See Chapman v. California, 386 U.S. 18 (1967). Because such errors are always serious business, the bar for such errors to be found harmless is set rather high, "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 23-24. The "beneficiary" in criminal cases will almost inevitably be the Commonwealth. The error here, however, does not have a constitutional dimension, as it is an evidentiary error.

contributed to, the verdict returned by the jury. See Morgan v. Commonwealth, 189 S.W.3d 99, 108 n.27 (Ky. 2006); Jarvis v. Commonwealth, 960 S.W.2d 466, 471 (Ky. 1998).

In recent years, the debate, at least as to the larger issue of "different result" versus "effect on the verdict," appears to have been settled, with the effect-on-the-verdict test being the correct standard. See Harp v. Commonwealth, 266 S.W.3d 813, 818 (Ky. 2008); Monroe v. Commonwealth, 244 S.W.3d 69, 78 (Ky. 2008); Emerson v. Commonwealth, 230 S.W.3d 563, 570 (Ky. 2007); Vaughn v. Commonwealth, 230 S.W.3d 559, 561 (Ky. 2007). The weight of critical opinion supports this shift. See, e.g., Harry T. Edwards, To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?, 70 N.Y.U. L. Rev. 1167 (1995) (arguing in favor of an effect-on-the verdict test); Roger J. Traynor, The Riddle of Harmless Error (1970) (same).

Deciding on "effect on the verdict" over "different result" alone does not answer all questions related to the harmless error doctrine, however. For example, how much effect must the error have had on the verdict before the error is sufficiently prejudicial to require reversal? Is any effect enough or must there be a substantial effect? These are difficult questions to which we have unfortunately provided inconsistent answers. Though the general focus on effects on the verdict has been steady in our recent decisions, the exact formulations of the standard to be applied have differed, sometimes substantially. See Harp, 266 S.W.3d at 818 (explaining the test as simply

whether an error affected the verdict); Monroe, 244 S.W.3d at 78 (describing the test as whether an error had a "reasonable probability" affecting the verdict); Emerson, 230 S.W.3d at 570 (applying a test of whether there was a "reasonable possibility that [the error] affected the verdict"); Vaughn, 230 S.W.3d at 561 (employing a test of whether the error "possibl[y] . . . had an effect on the verdict"). Though these "tests" arguably differ little, and despite a proper core concern for the impact of an error on a jury's verdict, they are inconsistent.

Rather than continuing to muddle through the muck and trying to invent the wheel anew, our most recent cases have sought guidance from the federal courts. Specifically, we have adopted the harmless-error standard announced in Kotteakos v. United States, 328 U.S. 750 (1946). See Crossland v. Commonwealth, 291 S.W.3d 223, 233 (Ky. 2009) (applying Kotteakos as the harmless error standard for non-constitutional errors); Winstead v. Commonwealth, 283 S.W.3d 678, 689 (Ky. 2009) ("The Kotteakos standard is the appropriate standard for non-constitutional errors."). The standard articulated by the United States Supreme Court in that case requires that a non-constitutional error have a substantial effect on the verdict before reversal is merited:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that

45

substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Id. at 764-65 (1946) (emphasis added). Restated in simplest terms, a non-constitutional evidentiary error must have had a substantial effect on the verdict actually returned by the jury or the judgment entered by the court in order to require reversal.

Though we have finally adopted what I consider to be the proper standard for evaluating harmless error, we still have not engaged in a thoughtful discussion of why it is the correct standard in a published decision, having instead simply declared it to be the appropriate standard, despite the fact that it represents a clear departure from some of our earlier precedent. And even as the articulation of the rule has changed, we have failed even to admit in a published decision that the rule has changed or that the various standards we have articulated are different. Yet, that this new standard is different and how it is different are important going forward, as the harmless error standard goes to the heart of what we do when we review a criminal jury trial. Because the standard is different, it means that the results in some cases will be different, meaning that we cannot simply plug the correct standard into an opinion without demonstrating how it applies—or doesn't—which is what the majority has failed to do here. The inescapable conclusion is that the standard and the policy behind it matter. We must still think long and

46

hard on the issue of harmless error so that we can properly apply the new standard.

Ultimately, I think that the majority is wrong in its harmless error determination in this case. Why this is the case, however, requires a candid discussion about harmless error that acknowledges it is a difficult and subtle proposition, and not just a rule to preserve convictions for heinous crimes in the face of error. In explaining why I disagree with the majority's application, I hope to focus on what must be considered.

To begin with, I agree with our decisions designating Kotteakos as the appropriate standard for non-constitutional errors. Such errors are likely to be less serious than constitutional errors, and by their very nature, they rarely touch on those fundamental concerns and guarantees that lie at the heart of the criminal justice system and are more likely to be merely technical or relatively minor. This distinction between the various types of errors is anticipated by the harmless error rule itself, which focuses on "substantial justice" and "the substantial rights of the parties." RCr 9.24. Kotteakos, by offering a lesser standard than that required for constitutional errors, also recognizes the distinction.

My foremost concern is that the majority, in focusing on whether the properly admitted evidence in this case was overwhelming, has effectively applied the old different-result approach to harmless error rather than the effect-on-the-verdict approach under Kotteakos.

The different-result approach required that an appellate court look at all the evidence, minus that which was improperly admitted, and determine whether a jury would have returned a guilty verdict. This is different from a situation where an appellate court looks at sufficiency of the evidence and must determine whether the evidence is such that a reasonable jury could return a guilty verdict. This latter analysis is a way of looking at what the jury in the case actually did and evaluating whether it was reasonable. The former requires postulating a new, entirely hypothetical verdict, one that was not returned by the jury that actually heard the case, since that jury heard the improper evidence. Looking at the evidence and deciding a different result would not have occurred is tantamount to directing a verdict for the Commonwealth after the fact. Thus, the policy underlying the different-result approach is a dangerous one that threatens to undermine our rules concerning who gets to find the facts in a case.

Beyond the policy concerns, however, are substantial constitutional concerns about the different-result approach. "Here, special concern exists that judicial toleration of harmless error is not a license for judicial invasion of the issue-resolving province constitutionally reserved for the jury." Henry P. Monaghan, Harmless Error and the Valid Rule Requirement, 1989 Sup. Ct. Rev. 196, 200 (1989). The postulation of a non-existent jury verdict absent the error lies at the heart of the different-result test. As the United States Supreme Court has stated, such an approach runs afoul of the Sixth Amendment's jury

trial guarantee:

> Consistent with the jury-trial guarantee, ...the reviewing court [is] to consider ... not what effect the ... error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which the jury actually rested its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.
>     ... The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal ....

Sullivan v. Louisiana, 508 U.S. 275, 279-80 (1993) (emphasis added, quotation marks and citations omitted).

Any approach to harmless error that focuses on whether the result would have been different, including whether the other evidence in the case was overwhelming, is suspect for these reasons. It is possible that there could be substantial, even overwhelming, evidence of guilt in a case, and yet a piece of improper evidence could also have been admitted that substantially influenced the jury. This is, in fact, what I think happened in this case. Instead of looking at whether the other evidence was overwhelming, we should instead focus on what effect the erroneous testimony had on jury's verdict in this case. Otherwise, we return to the old standard, albeit under a different name.

Having said my piece about the harmless error standard, the remaining

task is to apply it to the facts of this case. When the effect-on-the-verdict test is applied to this case, I conclude that the introduction of Kaye Thomas's testimony could not be harmless.

Most of Ms. Thomas's testimony was not about the victim's life, but was instead about her and the community's reaction to his attack. While Thomas's testimony was no doubt heartfelt and motivated by a desire to do good, it was particularly prejudicial to the appellants. Thomas was emotional on the stand, breaking into tears at one point. She was condemnatory of the appellants, testifying that she started her card campaign to "protest against the violence that had been done" to the victim and stated that he had "met the devil." Ultimately, Thomas served as a proxy for the entire community to express outrage against the appellants. I can only conclude that such testimony, as emotional and echoing with community anger as it was, had a substantial effect on the guilty verdict in this case.

Moreover, we have consistently disapproved of "evidence which serves little or no legitimate evidentiary purpose other than to engender sympathy for the victim." Coulthard v. Commonwealth, 230 S.W.3d 572, 578 (Ky. 2007); Ice v. Commonwealth, 667 S.W.2d 671, 676 (Ky. 1984) ("Evidence to engender sympathy for the victim ...violate[s] the rule excluding evidence where its probative value is slight and far outweighed by its inflammatory nature."). As the majority notes, Thomas's testimony was not the sort of humanizing evidence allowed by Kentucky law; instead, it was "akin to victim impact

testimony." "[T]he introduction of victim impact evidence during the guilt phase is reversible error." Ernst, 160 S.W.3d at 763 (emphasis added); see also Sanborn v. Commonwealth, 754 S.W.2d 534, 542 (Ky. 1988), overruled on other grounds by Hudson v. Commonwealth, 202 S.W.3d 17 (Ky. 2006) ("[I]t is improper for the jury to base its decision on guilt or innocence, or on the appropriate punishment, on who is the victim.").

I have no doubt that the crime in this case is among the most heinous and barbaric ever committed. I have no doubt that Ms. Thomas is a loving, humanitarian person, who acted only with best of intentions and an innocent heart in testifying on behalf of the victim. But I also have no doubt that her inflammatory testimony was improper under the law of this Commonwealth and that it laid an inexorable taint on the jury's verdict.

## II. Second-Degree Manslaughter Instruction

The majority concludes that the appellants were not entitled to an instruction on second-degree manslaughter as a lesser-included offense of murder. I cannot join this conclusion either.

In reaching this conclusion, the majority reviews the evidence and finds that in this case the attack was so brutal that a jury could return a guilty verdict only under the theory that the act was intentional or wanton with extreme indifference to human life (i.e., aggravated wantonness). In essence, the majority finds that the evidence was such that it could never support a finding of mere wantonness. The problem with this finding is that it is not one

51

that can be made by a judge, or a collection of judges; it involves a pure question of fact that is reserved for the trier of fact, in this case, the jury.

As noted in the commentary to the Penal Code, there is only one difference between wanton murder and second-degree manslaughter: the lack of circumstances manifesting extreme indifference to human life. KRS 507.020 cmt. In essence, the basic wanton homicide is second-degree manslaughter; if a defendant acts wantonly but with the added element of circumstances manifesting extreme indifference to human life, then the crime is the higher offense of wanton murder. As Justice Cooper and Mr. Cetrulo have characterized it, "Wanton Murder is nothing more than Second-Degree Manslaughter with the increased culpability of 'circumstances manifesting extreme indifference to human life'" 1 William S. Cooper & Donald P. Cetrulo, Kentucky Instructions to Juries, Criminal § 3.23 (5th ed. 2007) (June 2008 supp.).

That this is a subtle distinction is important when it comes to instructing juries because it demonstrates the necessity of giving an instruction on both offenses. As the commentary to KRS 507.040 notes, whether wantonness is aggravated cannot be answered as a matter of law and must instead be left to the trier of fact. It is interesting that in reaching its decision, the majority cites the commentary to KRS 507.020, but fails to address the commentary to KRS 507.040, which plainly undercuts its decision.

This Court has repeatedly followed the commentary to KRS 507.040 to

hold, "'Whether wantonness is so extreme that it demonstrates [such] indifference is not a question that . . . can be further clarified; <u>it must be left directly to the trier of the facts</u>. If wantonness exists but is not so extreme, the homicide is manslaughter.'" <u>Nichols v. Commonwealth</u>, 657 S.W.2d 932, 935 (Ky. 1983) (quoting KRS 507.040 cmt.) (original brackets omitted, emphasis added); <u>see also</u> <u>Walden v. Commonwealth</u>, 805 S.W.2d 102, 105 (Ky. 1991) ("[W]hether the evidence proved wanton murder or second-degree manslaughter was a question of fact . . . whether wantonness is so extreme that it demonstrates such indifference to human life as to qualify as the culpable equivalent of intentional murder 'is not a question that, in our view, can be further clarified; it must [be] left directly to the trier of the facts.'").

This Court has repeatedly reversed convictions for a failure to instruct on second-degree manslaughter when the evidence would support a mental state of wantonness, because the fine distinction between wanton murder and second-degree manslaughter is for the jury to make. <u>See</u> <u>Parker v. Commonwealth</u>, 241 S.W.3d 805, 811 (Ky. 2007) ("Having found that both states of mind were supported in the evidence, the trial court usurped the role of the jury in determining that the evidence did not support a manslaughter second degree instruction. . . . [The jury was] not given the opportunity to consider a lesser state of wanton culpability. It is possible the jury would have found wanton murder anyway; however, it is also <u>possible</u> for a finding of lesser wanton behavior, even though unlikely. The point is that this was a question

53

for the jury, not the trial court."); <u>Rogers v. Commonwealth</u>, 86 S.W.3d 29, 45 (Ky. 2002); <u>Ward v. Commonwealth</u>, 695 S.W.2d 404 (Ky. 1985); <u>cf.</u> <u>Commonwealth v. Wolford</u>, 4 S.W.3d 534 (Ky. 1999) (finding it was proper to instruct on second-degree manslaughter); <u>Hudson v. Commonwealth</u>, 979 S.W.2d 106, 110 (Ky. 1998) ("Once the facts of a killing are established, whether the act itself is murder depends upon the mind of the killer. The state of that mind at the time of the killing is almost never clear, not even to the defendant himself.").

In fact, Justice Cooper and Mr. Cetrulo have gone so far as to say,

> In some instances, the 'whole law' principle requires an instruction on a lesser included offense simply because the provable elements of the primary and lesser included offenses are the same. Thus, <u>second-degree manslaughter is automatically a lesser included offense of wanton murder</u>, the only distinction between the two being that in the latter offense, the degree of wantonness is more severe.

Cooper and Cetrulo, <u>supra</u>, § 1.05[B] (emphasis added); <u>see id.</u> § 3.20 ("in any instance in which Wanton Murder is instructed upon, it is probably necessary to include instructions on the lesser offense of Second Degree Manslaughter").

Instead of relying on this voluminous case law and commentary on the statutes, the majority has based its decision on two older cases, <u>Crane v. Commonwealth</u>, 833 S.W.2d 813 (Ky. 1992), and <u>Cecil v. Commonwealth</u>, 888 S.W.2d 668 (Ky. 1994). In both cases, the Court held that the evidence did not support the giving of an instruction on second-degree manslaughter despite the trial court's having instructed on wanton murder. <u>Crane</u> went so far as to say

54

that extreme indifference to human life had been shown "as a matter of law." 833 S.W.2d at 817.

Crane and Cecil are problematic for a number of reasons, however. First, they come dangerously close to declaring a directed verdict against the defendant on the element of "circumstances manifesting extreme indifference to human life." Second, they require the court to evaluate and choose between conflicting evidence, a function reserved for the jury. In fact, Professors Lawson and Fortune have criticized Crane's holding that aggravated wantonness was shown "as a matter of law" for exactly this reason, stating that "[i]n so ruling, the Court seemed to judge the defendant's testimony unworthy of belief, a function normally left to the jury." Robert G. Lawson and William H. Fortune, Kentucky Criminal Law § 8-4(b), at 347 (1998). Third, they ignore the precedent that "no matter how preposterous, any [instruction] which is supported by the evidence must be submitted to the jury. 'It is the privilege of the jury to believe the unbelievable if the jury so wishes.'" Taylor v. Commonwealth, 995 S.W.2d 355, 361 (Ky. 1999) (quoting Mishler v. Commonwealth, 556 S.W.2d 676, 680 (Ky. 1977)). Professors Lawson and Fortune further criticize Crane (and implicitly Cecil) along these lines by noting, "the Court may have departed from this sound position when it declared as a matter of law that the defendant manifested extreme indifference to the value of human life." Lawson & Fortune, supra, § 8-4(b), at 347 n.163.

Crane and Cecil only make sense if, under the evidence in those cases, a

conviction for manslaughter would not have been valid had the requested instruction been given. Yet, such a result is unimaginable, as any reasonable court would uphold such a verdict, deferring to the jury's weighing of the evidence. Clearly, then, Crane and Cecil are outliers and depart both from reason and logic and from the majority of this Court's jurisprudence concerning lesser-included offenses, specifically second-degree manslaughter as a lesser-included offense of wanton murder. In fact, it appears to me that Crane and Cecil have been implicitly overruled already, since this Court has more recently decided Parker v. Commonwealth, which stated that whether a crime was wanton murder or second-degree manslaughter "was a question for the jury, not the trial court." 241 S.W.3d at 811

By his own admission, Hall physically attacked the victim in this case, but the extent of his involvement and state of mind are disputable given the evidence. Multiple versions of his story were presented through his various statements and the testimony of several witnesses, ranging from that he simply punched the victim and threw the Crock Pot on his leg to that he struck the victim in the head with the Crock Pot (possibly the fatal blow) and that he, rather than Edmonds, sodomized the victim with sticks. The blood spatters on his pants, compared to the blood-soaked clothing of Edmonds, also raise questions as to the degree of his participation.

Regardless of the level of his participation, most important is the fact that Hall's state of mind is not obvious from the nature of the attack. "The

56

state of that mind at the time of the killing is almost never clear, not even to the defendant himself." Hudson, 979 S.W.2d at 110. It is possible that Hall simply undertook a vicious attack with a wanton state of mind, meaning he was aware of and consciously disregarded a substantial and unjustifiable risk of death and that the risk was of such nature and degree that disregarding it constituted a gross deviation from the reasonable standard of conduct. The additional element of extreme indifference to the value of human life, while certainly plausible, was not proven as a matter of law.

Rather than being conclusive proof of his state of mind, the conflicting testimony simply raised a host of questions: Did he intend to kill Clifton Agnew? Did he intend to cause him serious physical injury? Or, did he act without any specific intent as to death or injury and instead was aware of and consciously disregarding a substantial and unjustifiable risk that death would occur? If the latter is true, did Hall act under circumstances manifesting extreme indifference to human life? The evidence could be construed to reflect all of these circumstances, especially since, as noted above, the distinction between the aggravated wantonness required to reach murder and the "mere" wantonness required for second-degree manslaughter is such a fine one that it inevitably must be left up to the jury. Regardless of how unlikely a finding on the lesser crime is, an instruction on second-degree manslaughter should have been given as to Hall. Parker, 241 S.W.3d at 811 ("When the evidence is subject to different interpretations by the jury, even though the trial court

might believe it unlikely that the jury could find the requisite state of mind for a lesser included offense, it is nonetheless required to instruct on the lesser-included offense if such an interpretation is possible.").

The jury instructions regarding Hall were sufficiently flawed by their failure to instruct on second-degree manslaughter so as to require reversal of his murder conviction, as such an error cannot be harmless. Commonwealth v. Swift, 237 S.W.3d 193, 196 (Ky. 2007) ("Furthermore, the trial court's failure to give a necessary lesser included offense instruction cannot be deemed a harmless error."); see also Cooper and Cetrulo, supra, § 1.05[B] ("Cases holding that if the defendant was convicted of the primary offense, a failure to instruct on a lesser included offense, or giving an erroneous instruction thereon, was harmless error probably have no present validity." (footnotes omitted)).

Whether Edmonds' conviction should be reversed is a more difficult question because he did not raise the failure to instruct the jury on second-degree manslaughter in his appeal, though he did join in Hall's request for the instruction at trial. I would address his claim of error under the palpable error rule, RCr 10.26, which focuses on manifest injustice. "To discover manifest injustice, a reviewing court must plumb the depths of the proceeding . . . to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." Martin v. Commonwealth, 207 S.W.3d 1, 4 (Ky. 2006).

Failure to give an instruction on a lesser-included offense is not always

palpable error, see Clifford v. Commonwealth, 7 S.W.3d 371, 376 (Ky. 1999) ("[W]e are unaware of any authority holding it to be palpable error to fail to instruct on a lesser included offense of that charged in the indictment."), but in "plumb[ing] the depths" of this proceeding, I think that the Martin standard has been met in this case. As with Hall, if there were an error in the instructions, then Edmonds was denied a possible defense to the charge of murder. Clearly, then, given the result as to Hall, and assuming for now entitlement to the instruction, had Edmonds' attorney raised the issue on appeal, reversal would be required. This is not a case where we are left to flail about simply to frame an issue, much less to discover the relevant case law: the issue in question has been fully explored and argued, albeit by Hall's counsel and the Commonwealth. It makes little sense not to address the issue and would be fundamentally unfair to grant relief to Hall but not Edmonds simply because his counsel raised different issues.

The question then is whether Edmonds was entitled to the instruction. Ultimately, the question as it relates to Edmonds goes solely to whether the evidence could support a finding that he acted with mere wantonness. Based on the evidence presented at trial, Edmonds' level of participation was either minimal (based on evidence of only slight involvement) or total (Hall claimed he was the principal attacker). Like with Hall, if the jury believed his account that he was only slightly involved, it easily could have found he acted wantonly but without extreme indifference to the value of human life. Thus, just as with

59

Hall, Edmonds was entitled to a second-degree manslaughter instruction.

## III. Conclusion

Consequently, I must dissent from the majority opinion as it applies the harmless error standard, and from what I believe is clear error in failing to properly instruct the jury.

Minton, C.J., joins this dissenting opinion.

COUNSEL FOR APPELLANT, DEREK RENE EDMONDS:


Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, Kentucky 40601


COUNSEL FOR APPELLANT, TYREESE HALL:

Kathleen Kallaher Schmidt
Appeals Branch Manager
Department of Public Advocacy
100 Fair Oaks Lane, Suite 301
Frankfort, Kentucky 40601-1109


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Samuel J. Floyd, Jr.
Assistant Attorney General
Office of Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204

# Supreme Court of Kentucky

## 2007-SC-000350-MR

DEREK RENE EDMONDS                      APPELLANT

                ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE JUDITH MCDONALD-BURKMAN, JUDGE
               NOS. 04-CR-001179-001 AND 04-CR-002445-001

COMMONWEALTH OF KENTUCKY            APPELLEE

AND                2007-SC-000359-MR

TYREESE HALL                     APPELLANT

                ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE JUDITH MCDONALD-BURKMAN, JUDGE
               NOS. 04-CR-001179-002 AND 04-CR-002445-003

COMMONWEALTH OF KENTUCKY            APPELLEE

## ORDER

On the Court's own motion, the Memorandum Opinion of the Court rendered November 25, 2009 in the above styled case shall be modified by the substitution of new pages 1 and 46 of the opinion as attached hereto. Said modification does not affect the holding, and is made only to reflect modification on page 46, line 13, by changing the word 'appropriates' to 'appropriate.'

Entered: December 1, 2009.

_____
CHIEF JUSTICE